Catherine E. Ybarra (SBN 283360)
Tyler Bean (*pro hac vice forthcoming*)
Sonjay C. Singh (*pro hac vice forthcoming*)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: 213-297-3807
Facsimile: 646-417-5967
cybarra@sirillp.com
tbean@sirillp.com
ssingh@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CARMEN RUDNICK, BOBI HINESMAN, DEBBIE GARCIA DEBOLT, CHRISTINE DIONNE, ROBIN SHINE, LISA CASTELLO, RICHARD CARPE,** and **WILLIS MARZOLF**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**SONY CORPORATION OF AMERICA** and **SONY ELECTRONICS, INC.,**<br><br>Defendants. | Case No. **'26 CV0297 H    BLM**<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs Carmen Rudnick, Bobi Hinesman, Debbie Garcia DeBolt, Christine Dionne, Robine Shine, Lisa Castello, Richard Carpe, and Willis Marzolf (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendants Sony Corporation of America and Sony Electronics, Inc. (collectively, "Defendants" or "Sony") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I.  <u>INTRODUCTION</u>

1.      When Congress passed the Video Privacy Protection Act in 1988, it sought to protect against "a new, more subtle and pervasive form of surveillance" resulting from "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems[.]" S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy). Moreover, Congress was particularly alarmed about surveillance of Americans' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

2.     Unfortunately, the pervasive media surveillance that Congress envisioned in 1988 has not only come to pass but has been vastly amplified due to technological advances unimaginable at the time. Indeed, unbeknownst to American consumers, many major television (also referred to herein as "TV") manufacturers now secretly install automatic content recognition software (the "ACR Tool") onto TVs, which then constantly record and transmit data relating to a consumer's use of those TVs.

3.     Sony is one of the largest television manufacturers in the world. In 2024, it ranked within the top five television manufacturers by market share.[1] Unfortunately, it is also one of the aforementioned TV manufacturers that has chosen to engage in mass surveillance of its customers.

4.     Smart TVs sold by Sony include the "Samba TV" software program, a leading ACR software and data collection tool present on tens of millions of TVs across over twenty TV brands (Sony's ACR-capable TVs are referred to herein as the "Sony TVs").[2]

---

[1] Rasmus Larsen, *Samsung Leads Global TV Market for 19th year, LG Tops OLED Segment,* FLATPANELSHD (February 20, 2025), https://www.flatpanelshd.com/news.php?subaction=showfull&id=1740046963#:~:text=According%20to%20data%20from%20market,had%20a%209.5%25%20market%20share (last accessed January 6, 2026).

[2] Katie North-Fisher, *A Closer Look at Samba TV's Partnership with Publicis Groupe's Epsilon*, SAMBA TV (Apr. 25, 2023), https://www.samba.tv/resources/a-closer-look-at-samba-tvs-partnership-with-publicis-groupes-epsilon (last accessed Dec. 26, 2025).

5.      Unbeknownst to Sony's customers, this ACR Tool records the image and audio played by the Sony TV screen *continuously*.[3] Then, the ACR Tool uses sophisticated machine learning algorithms to identify the content being played on the television, regardless of its source. This data includes the specific programs being watched by the viewer, information relating to content streamed through third-party apps, information relating to content accessed through video game systems or other connected devices, and even information displayed when the Sony TV is used as a computer monitor (collectively, the "Sensitive Information").

6.      Through sophisticated technical analysis of data collected through the ACR Tool and compiled from other sources, Sony is able to identify and trace the Sensitive Information back to specific consumers, even where multiple individuals in a household use the same Sony TV. Sony exploits this Sensitive Information by (a) selling targeted advertisements to its corporate advertising clients, and (b) providing it to third-party advertising companies such as Google and Twitter for targeted advertising.

7.      Each of the Plaintiffs and Class Members purchased a Sony TV and had their personal Sensitive Information tracked by Defendants using the ACR Tool. However, Defendants **never** obtained informed consent from Plaintiffs or Class

---

[3] *See Understanding Video-based Automatic Content Recognition*, SAMBATV at 6, available online at: https://www.samba.tv/resources/understanding-video-based-automatic-content-recognition-acr.

**CLASS ACTION COMPLAINT**

Members to collect their Sensitive Information or to share it with third parties, some of which constitute the largest advertisers and data compilers in the world.

8.    Moreover, Defendants' tracking of Sony TV users violated numerous state and federal laws, including the Video Privacy Protection Act ("VPPA"), which was passed specifically to prevent the disclosure and aggregation of data relating to an individual's video consumption.

9.    As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with electronics retailers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Information.

10.    Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq.*; violations of the Electronic Communications Privacy Act ("ECPA"); violations of the California Invasion of Privacy Act ("CIPA"); Cal. Pen. Code § 360, *et seq.*; violations of the California Unfair Competition Law ("UCL"), Cal.

**CLASS ACTION COMPLAINT**

Bus. & Prof. Code, § 17200, *et seq*.; and violations of the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.*

## II. <u>PARTIES</u>

***Plaintiff Carmen Rudnick***

11.     Plaintiff Rudnick is a citizen of the state of Pennsylvania residing in Chester County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

12.     Plaintiff Rudnick purchased a Sony TV in or around February 2022. She has used her Sony TV from the purchase date up through the present to watch television programs, stream video content, stream music, and to play video games.

13.     Unbeknownst to Plaintiff Rudnick, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Rudnick as she used her Sony TV, including the programs she watched, applications she downloaded, and other information displayed on her television screen through the normal course of use.

14.     Plaintiff Rudnick possesses a Google account.

15.     Plaintiff Rudnick never authorized Defendants to collect, store, analyze, monetize, and/or disclose her personally identifiable Sensitive Information.

**CLASS ACTION COMPLAINT**

***Plaintiff Bobi Hinesman***

16.    Plaintiff Hinesman is a citizen of the state of Georgia, residing in Fulton County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

17.    Plaintiff Hinesman purchased a Sony TV in or around 2021 and has used her Sony TV from the purchase date up through the present to watch television programming, stream video content, and play video games.

18.    Unbeknownst to Plaintiff Hinesman, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Hinesman as she used her Sony TV, including the programs she watched, applications she downloaded, and other information displayed on her television screen through the normal course of use.

19.    Plaintiff Hinesman possesses Google and Twitter accounts.

20.    Plaintiff Hinesman never authorized Defendants to collect, store, analyze, monetize, and/or disclose her personally identifiable Sensitive Information.

***Plaintiff Debbie Garcia DeBolt***

21.    Plaintiff Garcia DeBolt is a citizen of the state of California, residing in Sacramento County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

**CLASS ACTION COMPLAINT**

22.     Plaintiff Garcia DeBolt purchased her first Sony TV on or around November 2024. She purchased her second Sony TV on or around October 2025. She has used her Sony TVs to watch television programs and stream video content from their purchase dates up through the present.

23.     Unbeknownst to Plaintiff Garcia DeBolt, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Garcia DeBolt as she used her Sony TV, including the programs she watched, applications she downloaded, and other information displayed on her television screen through the normal course of use.

24.     Plaintiff Garcia DeBolt possesses a Google account.

25.     Plaintiff Garcia DeBolt never authorized Defendants to collect, store, analyze, monetize, and/or disclose her personally identifiable Sensitive Information.

***Plaintiff Christine Dionne***

26.     Plaintiff Dionne is a citizen of the state of Washington residing in Clark County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

27.     Plaintiff Dionne purchased a Sony TV in 2022 and used her Smart TV to watch television programs, stream video content, and play video games from the purchase date up through the present.

**CLASS ACTION COMPLAINT**

28.    Unbeknownst to Plaintiff Dionne, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Dionne as she used her Sony TV, including the programs she watched, applications she downloaded, and other information displayed on her television screen through the normal course of use.

29.    Plaintiff Dionne possesses a Google account.

30.    Plaintiff Dionne never authorized Defendants to collect, store, analyze, monetize, and/or disclose her personally identifiable Sensitive Information.

***Plaintiff Robin Shine***

31.    Plaintiff Shine is a citizen of the state of Illinois residing in McHenry County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

32.    Plaintiff Shine purchased a Sony TV in or around November 2018. She has used her Smart TV from the purchase date up through the present to watch television programming and stream video content.

33.    Unbeknownst to Plaintiff Shine, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Shine as she used her Sony TV, including the programs she watched, applications she downloaded, and other information displayed on her television screen through the normal course of use.

**CLASS ACTION COMPLAINT**

34.     Plaintiff Shine possesses Google and Twitter accounts.

35.     Plaintiff Shine never authorized Defendants to collect, store, analyze, monetize, and/or disclose her personally identifiable Sensitive Information.

### Plaintiff Lisa Castello

36.     Plaintiff Castello is a citizen of the state of California residing in San Luis Obispo County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

37.     Plaintiff Castello purchased a Sony TV in or around May 2025. She has used her Sony TV from the purchase date up through the present to watch television programs and stream video content.

38.     Unbeknownst to Plaintiff Castello, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Castello as she used her Sony TV, including the programs she watched, applications she downloaded, and other information displayed on her television screen through the normal course of use.

39.     Plaintiff Castello possesses a Google account.

40.     Plaintiff Castello never authorized Defendants to collect, store, analyze, monetize, and/or disclose her personally identifiable Sensitive Information.

*Plaintiff Richard Carpe*

41.    Plaintiff Carpe is a citizen of the state of California residing in Orange County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

42.    Plaintiff Carpe purchased a Sony TV in 2019 and has used his Sony TV to watch television programs and utilize streaming services from the purchase date up through the present.

43.    Unbeknownst to Plaintiff Carpe, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Carpe as he used his Sony TV, including the programs he watched, applications he downloaded, and other information displayed on his television screen through the normal course of use.

44.    Plaintiff Carpe possesses a Google account.

45.    Plaintiff Carpe never authorized Defendants to collect, store, analyze, monetize, and/or disclose his personally identifiable Sensitive Information.

*Plaintiff Willis Marzolf*

46.    Plaintiff Marzolf is a citizen of the state of California residing in San Joaquin County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

**CLASS ACTION COMPLAINT**

47. Plaintiff Marzolf purchased a Sony TV in or around September 2022. Plaintiff Marzolf has used his Sony TV from the purchase date up through the present to watch streaming video content.

48. Unbeknownst to Plaintiff Marzolf, the ACR Tool surreptitiously intercepted and disclosed the Sensitive Information that was communicated to and from Plaintiff Marzolf as he used his Sony TV, including the programs he watched, applications he downloaded, and other information displayed on his television screen through the normal course of use.

49. Plaintiff Marzolf possesses a Google account..

50. Plaintiff Marzolf never authorized Defendants to collect, store, analyze, monetize, and/or disclose his personally identifiable Sensitive Information.

**Defendant Sony Electronics, Inc.**

51. Defendant Sony Electronics, Inc. is a for-profit corporation incorporated in the state of Delaware, with its principal place of business located at 16535 Via Esprillo, San Diego, California, in San Diego County.

**Defendant Sony Corporation of America**

52. Defendant Sony Corporation of America is a for-profit corporation incorporated in the state of New York, with its principal place of business located at 25 Madison Avenue, New York, New York, in New York County.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    JURISDICTION AND VENUE

53.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because some Plaintiffs and many putative class members are citizens of a different state than Sony. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

54.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, et seq.) and VPPA (18 U.S.C. § 2710, et seq.).

55.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

56.    This Court has personal jurisdiction over Defendants because Defendants have advertised and offered their products to consumers in the State of California and in this judicial district, including to Plaintiffs Garcia DeBolt, Castello, Carpe, and Marzolf. Defendants have also otherwise made or established contacts in the State of California and in this judicial district sufficient to permit the exercise of personal jurisdiction.

**CLASS ACTION COMPLAINT**

57.     Personal jurisdiction is also proper as to Defendant Sony Electronics, Inc. because it is headquartered in the State of California, in this judicial district.

58.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV.     FACTUAL ALLEGATIONS

### A.     SONY'S SURVEILLANCE OF ITS TELEVISION CUSTOMERS

#### i.     Sony's Television Business

59.     Sony regularly ranks among the top TV manufacturers by market share, selling millions of TVs each year.[4] Sony sold approximately 8.5 million TVs in its 2022 fiscal year.[5]

60.     Smart TVs represent a substantial portion of TVs sold each year and Sony has increasingly moved to increase the profitability of its television business through the collection and monetization of customer data. As one commentator explains:

> [T]he entry of Chinese manufacturers including Hisense and TCL into the TV business in the 2000s [led] to unprecedented price competition [for Sony and other major TV retailers]. As the retail price of TVs fell, the margins of TV manufacturers became wafer-thin. Average margins in TV hardware are now less than 1%, whereas margins in connected TV advertising are 50% or more. Faced with these shrinking hardware margins, manufacturers have increasingly turned to services – advertising, content sales, and data brokerage – to improve their bottom lines. Just as

---

[4] *Number of Units Sold by Sony Group (FY2017 – FY2021)*, GLOBAL DATA, https://www.globaldata.com/data-insights/technology-media-and-telecom/number-of-units-sold-by-sony-group/ (last accessed January 6, 2026).

[5] *Id.*

Apple's App Store established a lucrative services business alongside Apple's hardware business, TV manufacturers are similarly keen to move up the value chain to higher margin activities.[6]

61.    Upon information and belief, Sony began incorporating ACR technology supplied by SambaTV in or around 2013. The data that Sony harvests from its TV-users is valuable, providing Sony with the ability to continually profit from customers beyond the purchase price of the TV by monetizing their viewing data.

**ii.    Sony's Use of the ACR Tool to Surveil Plaintiffs and Class Members**

62.    Sony's massive advertising enterprise would not be possible without the data collected through use of the ACR Tool. As the developer of the ACR Tool, Samba TV, explains, "ACR analyzes household viewership across all platforms and services and provides more comprehensive and representative data for advertisers looking to accurately target modern audiences.."[7] Sony TVs use Samba TV, a leading ACR software tool present on over twenty TV brands with access to data from millions of U.S. households.[8]

---

[6] Ramon Lobato, *Automated content recognition (ACR), smart TVs, and ad-tech infrastructure*, 31(6) CONVERGENCE: THE INT'L JOURNAL OF RESEARCH INTO NEW MEDIA TECHS. (July 15, 2025), at 1806, *available online at*: https://journals.sagepub.com/doi/10.1177/13548565251327885.

[7] Robbie Percell, *The Power of a Holistic ACR and STB data Strategy in Audience Targeting,* SAMBA TV (MAY 26, 2023), https://www.samba.tv/resources/the-power-of-a-holistic-acr-stb-data-strategy-in-audience-targeting (last accessed January 8, 2026).

[8] Katie North-Fisher, *A Closer Look at Samba TV's Partnership with Publicis Groupe's Epsilon*, SAMBA TV (Apr. 25, 2023), https://www.samba.tv/resources/a-closer-look-at-samba-tvs-partnership-with-publicis-groupes-epsilon (last accessed Jan. 6, 2026).

63.    The ACR Tool installed on Sony TVs operates by recording the image played by the Sony TV screen continuously whenever the TV is in-use.[9] Then, this output is analyzed by deep learning software programs to identify whatever visual elements are present on the screen, such as a specific face, product, brand name, or object.[10] The resulting "video footprint" created by the ACR Tool is then compared to a content database to determine the specific program being viewed by the Sony TV user.[11]

64.    However, the ACR Tool tracks far more than simply the television programs enjoyed by its customers. Rather:

> **ACR takes in everything on your screen, not just TV shows**…ACR is capturing anything that appears on your screen, including YouTube videos, personal photos, security or doorbell camera streams, and video or photos you send via Apple AirPlay or Google Cast. ACR can even snag content from other devices connected to your TV by HDMI, including personal laptops, video game consoles, and Blu-ray players.[12]

65.    This information is then linked to other information collected about the television user from other sources. As Samba TV explains, by "leverag[ing] a multi-identifier approach, using various types of digital identifiers as well as first party TV data[, Samba TV's ACR software] can identify at 90%+ accuracy which phones, tablets,

---

[9] *See Understanding Video-based Automatic Content Recognition*, SAMBA TV at 6, available online at: https://www.samba.tv/resources/understanding-video-based-automatic-content-recognition-acr (last accessed January 8, 2026).

[10] *See Id.* at 8.

[11] *Id*. at 6.

[12] Rachel Cericola, Jon Chase and Lee Neikirk, *Yes, Your TV Is Probably Spying on You. Your Fridge, Too. Here's What They Know*, NEW YORK TIMES (June 25, 2025), https://www.nytimes.com/wirecutter/reviews/advice-smart-devices-data-tracking/ (last accessed Jan. 6, 2026).

**CLASS ACTION COMPLAINT**

PCs, and TVs belong to an individual[.]"[13] As a result, Sony is able to coordinate advertising delivered on a consumer's ACR-enabled television with advertising delivered on the user's other devices, such as a second screen being used by the user simultaneously while watching a Sony TV.[14] Of course, the fact that Sony can link Sensitive Information collected through the ACR Tool to data collected from the user's other devices necessarily means that the data collected from the ACR Tool is personally identifiable.

66. As the ACR Tool collects and analyzes all of the information displayed on the user's Sony TV screen at all times, some of the information captured necessarily includes highly sensitive, personally identifiable information. For example, when a user logs into a streaming app or video game platform (e.g., Netflix, Hulu, PlayStation Plus), the ACR Tool may capture the e-mail address associated with the user's account. If the user accesses an account information page in a streaming application, the ACR Tool may capture the user's account information, including the user's full name, address, and billing information. Moreover, as Sony TVs can be used as a computer monitor, the ACR Tool could even capture extensive, highly sensitive information accessed by the

---

[13] *Bridge datasets in the evolving identity world*, SAMBA TV, https://www.samba.tv/business/identity (last accessed Jan. 6, 2026).

[14] *See Understanding Video-based Automatic Content Recognition*, SAMBA TV, at 9, *available online at*: https://www.samba.tv/resources/understanding-video-based-automatic-content-recognition-acr.

**CLASS ACTION COMPLAINT**

user online, such as information from medical provider online portals, banking provider financial portals, and communicated through social media and e-mail messages.

67.    Through this highly invasive data collection, the ACR Tool amasses a wealth of intimate knowledge about Sony TV owners, allowing Sony to target consumers based on highly sensitive attributes such as religion, political affiliation, and ethnicity.[15]

68.    Further, as if this mass surveillance were not bad enough already, Sony's misuse of its customers' Sensitive Information is not limited to merely its own advertising operations. Rather, the raw data collected by the ACR Tool is shared with third-party advertising companies including Google, Catalina, Kantar Milward Brown, and Twitter, without the Sony TV owner's knowledge or consent.[16]

69.    Through the use of tracking cookies that Google and Twitter's applications and web services automatically install on user devices, Google and Twitter are generally able to identify data pertaining to their accountholders regardless of its source.[17] Thus, Plaintiffs allege upon information and belief that all Sensitive Information transmitted

---

[15] *See Audiences*, SAMBA TV, https://www.samba.tv/business/audience/ui (last accessed Jan. 8, 2026) (providing options for advertisers to target consumers based on a variety of demographic categories).

[16] *Data,* SAMBA TV, https://www.samba.tv/business/data (last accessed Jan. 6, 2026).

[17] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

by Sony to Google and Twitter was automatically linked to any Google and/or Twitter account held by the relevant Plaintiff or Class Member.[18]

## B. PLAINTIFFS AND CLASS MEMBERS DID NOT CONSENT TO SONY'S COLLECTION AND MONETIZATION OF THEIR SENSITIVE INFORMATION THROUGH THE ACR TOOL

### i. Plaintiffs' and Class Members' Reasonable Expectation of Privacy

70.     At all times when Plaintiffs and Class Members provided their Sensitive Information to Sony, they each had a reasonable expectation that the information would remain confidential and that Sony would not share the Sensitive Information with third parties for a commercial purpose, unrelated to providing them with video content.

71.     Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

72.     For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those

---

[18] A remarkable number of Americans possess a Google or Twitter account. One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client. *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Oct. 23, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024). And, Twitter has 56-million American users. *See Twitter Statistics*, BACKLINKO (Sep. 23, 2025), https://backlinko.com/twitter-users (last visited Jan 14, 2026).

**CLASS ACTION COMPLAINT**

companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[19]

73.    Personal data privacy and obtaining consent to share Sensitive Information are material to Plaintiffs and Class Members.

### ii.    Plaintiffs Did Not (and Could Not) Consent to Sony's Surveillance Practices

74.    In its Privacy Policy, Sony deceptively labels its ACR collection practices as "Interactive TV Settings" or "Samba Interactive TV." Additionally, the Privacy Policy accessible on Sony's TVs informs its customers only that "[i]f you consent to this privacy policy, we will use TV data to provide Sony Smart TV functionality."

75.    These representations are misleading. Sony does not explain that it collects, monetizes, and discloses a user's viewing history, along with data reflecting any other actions the customer takes using their Sony TV. No reasonable consumer could possibly infer from the euphemistic representations in the Privacy Policy that Sony captures *all* video and audio output from the consumer's Sony TV *continuously*, correlates that data with additional user-specific data collected from the consumer's other devices, and then provides that data to advertisers in a manner allowing it to be linked to the consumer's identity with an extremely high rate of accuracy. Further, the

---

[19] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Feb. 1, 2025).

Privacy Policy does not put consumers on notice that, not only is video content that they watch or stream on the Sony TV captured, but if they use a Sony TV's external input (for example, to connect a video game console or personal computer) then the video content of the externally connected device will *also* be captured by the ACR Tool.

76.    Additionally, Sony packages this disclosure with several others during the mandatory set-up process for its Sony TVs and prompts users to agree to all notices simultaneously. Thus, users have little reason to scroll through these notices and, indeed, are not required to do so before agreeing to all of them.

77.    Opt-out rights for Sony's data collection are further scattered across several menus and submenus that require the user to navigate confusing and ambiguously named options. For example, users must navigate through several submenus to reach the "Interactive TV" option, which can be disabled. Notably, the option to turn this feature off is *not* located under the "Privacy" settings, which suggests that it is unrelated to user privacy. Indeed, Sony does not explain that the "Interactive TV" feature is related to the ACR Tool and that it continuously monitors the content that user's view on their Sony TV.  Thus, a reasonable consumer would have no reason to know that this feature relates to Sony's extensive data collection regarding how they use their Sony TV.

**CLASS ACTION COMPLAINT**

78.     Sony also allows users to select an option to receive "less personalized ads" but it is unclear whether this option affects the continuous capture of user data by the ACR Tool.

79.     Conversely, Sony provides consumers with a one-click enrollment option to opt-in during the initial start-up process.

80.     In short, Sony deliberately designed both the form and content of its ACR disclosures to obfuscate its invasive surveillance of its customers. The simplicity of opting into Sony's extensive data collection versus opting out is clearly designed to mislead customers into sharing Sensitive Information that they would be disinclined to share if Sony was transparent about the ACR Tool and its data collection practices.

81.     Unfortunately, such gamesmanship appears to be working as intended. Indeed, according to one survey of 36,000 U.S. consumers, only 13-percent of smart TV owners knew they were being monitored and remembered agreeing to their smart TV's terms of service, and that 75-percent of respondents did not know how they had given their consent in the first place.[20]

---

[20] Katie McQuater, *US consumers lack awareness of consent around smart TVs, finds study*, RESEARCHLIVE (July 9, 2018), https://www.research-live.com/article/news/us-consumers-lack-awareness-of-consent-around-smart-tvs-finds-study/id/5040713 (last visited Dec. 30, 2025).

**CLASS ACTION COMPLAINT**

## C. SONY WAS ENRICHED BY ITS COLLECTION, MONETIZATION, AND UNAUTHORIZED DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION

### i. Sony Derived Significant Benefits from Its Collection and Use of Plaintiffs' and Class Members' Sensitive Information

82. As detailed above, the extensive array of data collected by the ACR Tool allows Sony to engage in comprehensive, targeted advertising.

83. As a direct result of its surreptitious collection, use, and disclosure of Plaintiffs and Class Members' Sensitive Information, Sony is able to amass significant yearly revenue and value attributable to that targeted advertising.

### ii. Plaintiffs' and Class Members' Data Had Financial Value

84. Moreover, Plaintiffs' and Class Members' Sensitive Information had value, and Defendants' disclosure and interception of that Sensitive Information harmed Plaintiffs and the Class.

85. According to the financial statements of Facebook, a major data and advertisement broker, the value derived from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[21]

---

[21] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 1, 2025).

86.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

87.    Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

88.    The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

## D.    SONY'S USE OF THE ACR TOOL VIOLATES THE VIDEO PRIVACY PROTECTION ACT ("VPPA")

89.    The VPPA was passed in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

90.    In passing the VPPA, Congress was particularly alarmed about surveillance of Americans' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

1
2

*Id.* (statement of Rep. Al McCandless).

3      91.    Although the VPPA was originally intended to protect the privacy of an

4  individual's rental videotape selections, Congress has repeatedly reiterated that the

5  VPPA is applicable to "'on-demand' cable services and Internet streaming services

6  [that] allow consumers to watch movies or TV shows on televisions, laptop computers,

7  and cell phones." S. Rep. 112-258, at p. 2.[22]

8
9      92.    Under the VPPA, "[a] video tape service provider" is prohibited from

10  "knowingly disclos[ing], to any person, personally identifiable information concerning

11  any consumer of such provider" without the consumer's "informed, written

12  consent… in a form distinct and separate from any form setting forth other legal or

13  financial obligations of the consumer." 18 U.S.C. § 2710(b).

14
15     93.    The VPPA defines a "video tape service provider" as "any person, engaged

16  in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery

17
18
19
20
21

22  _____

[22] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st
23  Century*, SENATE JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW
    (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-
24  transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-
    century (statement by Senator Leahy, who originally introduced the VPPA in the Senate:
25  "Now, it is true that technology has changed…but I think we should all agree that we
    have to be faithful to our fundamental right to privacy and freedom. Today the social
26  networking, video streaming, the cloud, mobile apps, and other new technologies have
27  revolutionized the availability of Americans' information.").

28

**CLASS ACTION COMPLAINT**

of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

94.     The VPPA additionally defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

95.     Sony is a video tape services provider within the meaning of the VPPA, as it provides on-demand access to video content through both third-party apps offered through the Sony TVs as well as its own content provided to Sony TV owners through the Sony Pictures Core on-demand video platform. Accordingly, Defendants' disclosure of the specific videos viewed by their customers through on-demand streaming services constitutes a violation of VPPA. *See, e.g., Fan v. NBA Props. Inc*., No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve") (citation omitted).

## V. <u>TOLLING AND ESTOPPEL</u>

96.     Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of its installation of the ACR Tool onto Sony TVs.

97.     The ACR Tool installed on the Sony TVs was and is invisible to the average Sony TV owner.

98.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

99.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

100.    Defendants had exclusive knowledge that the ACR Tool was installed on the Sony TVs and yet failed to disclose to customers, including Plaintiffs and Class Members, that by using a Sony TV, Plaintiffs' and Class Members' Sensitive Information would be collected and disclosed or released to unauthorized third parties.

101.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of their collection and treatment of their customers' Sensitive Information. Accordingly, Defendants are estopped from relying on any statute of limitations.

102.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

103.    The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# VI.    CLASS ALLEGATIONS

104.   This action is brought by the named Plaintiffs both individually, and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

105.   The Nationwide Class that Plaintiffs seek to represent is defined as follows:

### The Nationwide Class

All natural persons who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

106.   In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate Pennsylvania, Georgia, California, Washington and Illinois Subclasses, which are defined as follows:

### Pennsylvania Subclass

All natural persons residing in Pennsylvania who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

### Georgia Subclass

All natural persons residing in Georgia who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

**California Subclass**

All natural persons residing in California who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

**Washington Subclass**

All natural persons residing in Washington who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

**Illinois Subclass**

All natural persons residing in Illinois who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

107.   The Nationwide Class, Pennsylvania Subclass, Georgia Subclass, California Subclass, Washington Subclass, and Illinois Subclass are collectively referred to herein as the "Class."  Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

108.   Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

**CLASS ACTION COMPLAINT**

109.  **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 100,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

110.  **Commonality.** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)  Whether and to what extent Defendants had a duty to protect the Sensitive Information of Plaintiffs and Class Members;

b)  Whether Defendants had duties not to collect and/or disclose the Sensitive Information of Plaintiffs and Class Members to unauthorized third parties;

c)  Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Information would be collected and disclosed to third parties;

d)  Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Information was being collected and disclosed without their consent;

e)  Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized collection and disclosure of patients' Sensitive Information;

f)  Whether Defendants violated the Video Privacy Protection Act, as alleged in this Complaint;

**CLASS ACTION COMPLAINT**

g)      Whether Defendants violated the statutes mentioned in this Complaint;

h)      Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i)      Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' collection and disclosure of their Sensitive Information.

111.   **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the ACR Tool.

112.   **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights, and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

113.   **Predominance.** Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, like Google, in the same way. The common issues arising from Defendants'

conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

114. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

115. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

116. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the

**CLASS ACTION COMPLAINT**

resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

b) Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

c) Whether Defendants failed to comply with applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Sensitive Information would be collected disclosed to third parties;

e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information collected and disclosed to third parties;

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

117. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**CLASS ACTION COMPLAINT**

## COUNT I
## COMMON LAW INVASION OF PRIVACY
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Pennsylvania, Georgia, California, Washington and Illinois Subclass(es))*

118.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119.   Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with their Sony TVs without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

120.   Plaintiffs and Class Members had a reasonable expectation of privacy in the information transmitted and received through use of their Sony TV and the communications platforms and services therein.

121.   Defendants' interception and disclosure of the substance and nature of those communications without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

122.   Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

**CLASS ACTION COMPLAINT**

123.   Defendants' disclosure of Plaintiffs' and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

124.   As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

125.   Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

126.   Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

127.   Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

128.   Plaintiffs also seek such other relief as the Court may deem just and proper.

# COUNT II
## NEGLIGENCE
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Pennsylvania, Georgia, California, Washington and Illinois Subclass(es))*

129.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.    Through using their Sony TV, Plaintiffs and Class Members provided Defendants with their Sensitive Information.

131.    By collecting and storing data related to Plaintiffs and Class Members use of their Sony TV, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

132.    Defendants negligently, recklessly, and/or intentionally failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to Google and Twitter.

133.    Defendants further negligently, recklessly, and/or intentionally omitted to inform Plaintiffs and the Class that they would collect and use their Sensitive Information for marketing purposes, or that their Sensitive Information would be transmitted to third parties.

134.    Defendants knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Information to Defendants had Plaintiffs and the Class known that Defendants intended to use that information for unlawful purposes.

**CLASS ACTION COMPLAINT**

135.   Defendants' conduct has caused Plaintiffs and the Class to suffer damages by having their highly confidential, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

136.   Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

137.   Defendants' negligent conduct is ongoing, in that they still hold the Sensitive Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) cease collection and dissemination of the Sony TV users' Sensitive Information to third parties; and (iii) submit to future annual audits of those systems and monitoring procedures.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Pennsylvania, Georgia, California, Washington and Illinois Subclass(es))*

138.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 137 as if fully set forth herein.

139.   When Plaintiffs and Class Members provided their Sensitive Information to Defendants in exchange for services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose their Sensitive Information without consent.

**CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

140.   Plaintiffs and Class Members accepted Defendants' offers and provided their Sensitive Information to Defendants.

141.   Plaintiffs and Class Members would not have entrusted Defendants with their Sensitive Information in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Sensitive Information without consent.

142.   Defendants breached these implied contracts by accessing and disclosing Plaintiffs' and Class Members' Sensitive Information to third parties like Google and Twitter.

143.   As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

144.   Plaintiffs and Class Members would not have bought a Sony TV if they had known their Sensitive Information would be accessed and disclosed without their informed consent.

145.   Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendants' breaches of implied contract.

## COUNT IV
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Pennsylvania, Georgia, California, Washington and Illinois Subclass(es))*

146.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 145 as if fully set forth herein.

**CLASS ACTION COMPLAINT**

147.   Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

148.   Plaintiffs and Class Members conferred a monetary benefit on Defendants in the form of (a) payment for their Sony TVs, and (b) providing their inherently valuable Sensitive Information to Defendants, which Defendants used to profit through the targeted advertising sales, described *supra*.

149.   Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from the Sensitive Information of Plaintiffs and Class Members by using it for marketing and advertising.

150.   Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the privacy of their Sensitive Information.

151.   Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, obtained by its surreptitious collection and transmission of their Sensitive Information.

152.   If Plaintiffs and Class Members knew that Defendants would be disclosing their Sensitive Information to unauthorized third-parties, they would not have agreed to provide their Sensitive Information to Defendants.

**CLASS ACTION COMPLAINT**

153.   Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damage.

154.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

155.   Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them and from the collection and unauthorized distribution of the Sensitive Information, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

## COUNT V
### VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*
### *(On Behalf of Plaintiffs and the Nationwide Class)*

156.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

157.   The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1).

158.   "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

**CLASS ACTION COMPLAINT**

159.   A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

160.   Defendants are "video tape service providers" because they provide on-demand access to video content through both third-party apps offered through the Sony TVs as well as their own content provided to Sony TV owners through the Sony Pictures Core on-demand video platform.  Defendants are thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

161.   Defendants violated the VPPA by knowingly disclosing Plaintiffs' and Class Members' personally identifiable Sensitive Information to third party advertising partners, including Google, Catalina, Kantar Milward Brown and Twitter, without obtaining informed, written consent.

162.   As a result of Defendants' violations of the VPPA, Plaintiffs and the Class are entitled to all damages available under the VPPA including declaratory relief, injunctive and equitable relief, statutory damages of $2,500 for each violation of the VPPA, and attorney's fees, filing fees, and costs.

**CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VI
### VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*
### Unauthorized Interception, Use, and Disclosure
### *(On Behalf of Plaintiffs and the Nationwide Class)*

163.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 162 as if fully set forth herein.

164.   The ECPA protects both the sending and receipt of communications.

165.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

166.   The transmissions of Plaintiffs' Sensitive Information while using their Sony TVs qualify as "electronic communications" under the ECPA. 18 U.S.C. § 2510(12).

167.   <u>Electronic Communications.</u> The transmission of Sensitive Information between Plaintiffs and Class Members and Defendants' Sony TVs with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

168.   <u>Content.</u> The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

169.   <u>Interception.</u> The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

170.   <u>Electronic, Mechanical or Other Device.</u> The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a)   Plaintiffs' and Class Members' Sony TVs;
b)   Defendants' web-servers; and
c)   The ACR software code(s) deployed by Defendants to effectuate the sending and acquisition of user communications.

171.   By utilizing and embedding the ACR Tool on the Sony TVs, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

172. Specifically, Defendants intercepted Plaintiffs' and Class Members' electronic communications via the ACR Tool, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Sensitive Information to third parties such as Google and Twitter.

173. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Information.

174. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

175. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

176. Unauthorized Purpose. Defendants intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of

committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

177.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

178.    Defendants are not parties for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class.    However, even assuming Defendants are parties, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Information does not qualify for the party exemption.

179.    Defendants' acquisition of sensitive communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a)    Invasion of privacy;
b)    Breach of implied contract;
c)    Violations of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;
d)    Violations of the California Invasion of Privacy Act, Cal. Pen. Code § 360, *et seq.*;
e)    Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq.*; and
f)    Violations of the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.*

**CLASS ACTION COMPLAINT**

180.   Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used personally identifiable data associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Information to Google and Twitter without user authorization.

181.   Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that they were participants in Plaintiffs' and Class Members' communications about their Sensitive Information through their Sony TVs, because they used their participation in these communications to improperly share Plaintiffs' and Class Members' Sensitive Information with Google, Twitter, and other third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Sensitive Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Information.

182.   As such, Defendants cannot viably claim any exception to ECPA liability.

183.   Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendants' invasion of privacy in that:

   a) Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their Sensitive Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

   b) Defendants received substantial financial benefits from their use of Plaintiffs' and Class Members' Sensitive Information without providing any value or benefit to Plaintiffs or Class Members;

c) Defendants received substantial, quantifiable value from their use of Plaintiffs' and Class Members' Sensitive Information, such as understanding how people use the Sony TVs and determining what ads people see on the Sony TVs, without providing any value or benefit to Plaintiffs or Class Members;

d) The diminution in value of Plaintiffs' and Class Members' Sensitive Information and/or the loss of privacy due to Defendants making such Sensitive Information, which Plaintiffs and Class Members intended to remain private, no longer private.

184. Defendants intentionally used the wire or electronic communications to increase its profit margins. Defendants specifically used the ACR Tool to track and utilize Plaintiffs' and Class Members' Sensitive Information for financial gain.

185. Defendants were not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

186. Plaintiffs and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading their privacy via the ACR Tool.

187. Any purported consent that Defendants may claim to have received from Plaintiffs and Class Members was not valid.

188. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to the usage of the Sony TVs, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

**CLASS ACTION COMPLAINT**

189.   As a result of Defendants' violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VII**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**Cal. Pen. Code § 360,** *et seq.*
***(On Behalf of Plaintiffs Garcia DeBolt, Castello, Carpe, and Marzolf, and the California Subclass)***

190.   Plaintiffs Garcia DeBolt, Castello, Carpe, and Marzolf repeat and reallege the allegations contained in paragraphs 1 through 189 as if fully set forth herein.

191.   The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

192.   Under CIPA, it is unlawful to:

a) "[W]illfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any

**48**
**CLASS ACTION COMPLAINT**

message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

b) "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

c) "[A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

193.   At all relevant times, Defendants tracked and intercepted Plaintiff Garcia DeBolt's, Plaintiff Castello's, Plaintiff Carpe's, Plaintiff Marzolf's, and California Subclass Members' internet communications made through their Sony TVs by installing and configuring the ACR Tool without their knowledge.

194.   The content of those conversations included Sensitive Information. Through Defendants' installation and configuration of the ACR Tool on the Sony TVs, these communications were intercepted by Sony and disclosed to unauthorized third parties without the knowledge, authorization, or consent of Plaintiff Garcia DeBolt, Plaintiff Castello, Plaintiff Carpe, Plaintiff Marzolf, and California Subclass Members.

195.   Defendants intentionally installed an electronic device onto the Sony TVs that, without the knowledge and consent of Plaintiff Garcia DeBolt, Plaintiff Castello, Plaintiff Carpe, Plaintiff Marzolf, and California Subclass Members, collected and transmitted the substance of their confidential communications.

196. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the ACR Tool falls under the broad catch-all category of "any other manner":

a) The ACR software code;

b) Plaintiff Garcia DeBolt's, Plaintiff Castello's, Plaintiff Carpe's, Plaintiff Marzolf's, and the California Subclass Members' web-enabled Sony TVs;

c) Plaintiff Garcia DeBolt's, Plaintiff Castello's, Plaintiff Carpe's, Plaintiff Marzolf's, and the California Subclass Members' computing and mobile devices; and

d) Defendants' web and ad servers.

197. As demonstrated hereinabove, Defendants violated CIPA intercepting and disclosing Plaintiffs' and Class Members' Sensitive Information in real time through the ACR Tool without their consent

198. By disclosing Plaintiff Garcia DeBolt's, Plaintiff Castello's, Plaintiff Carpe's, Plaintiff Marzolf's, and the California Subclass Members' Sensitive information, Defendants violated Plaintiff Garcia DeBolt's, Plaintiff Castello's, Plaintiff Carpe's, Plaintiff Marzolf's, and California Subclass Members' statutorily protected right to privacy.

199.   As a result of Defendants' violation of the CIPA, Plaintiff Garcia DeBolt, Plaintiff Castello, Plaintiff Carpe, Plaintiff Marzolf, and the California Subclass Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

**COUNT VIII**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code, § 17200, *et seq.***
***(On Behalf of Plaintiffs DeBolt, Castello, Carpe, and Marzolf, and the California Subclass)***

200.   Plaintiffs Garcia DeBolt, Castello, Carpe, and Marzolf repeat and reallege the allegations contained in paragraphs 1 through 199 as if fully set forth herein.

201.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code, § 17200.

202.   Defendants violated the "unlawful" prong of the UCL by violating Plaintiff Garcia DeBolt's, Plaintiff Castello's, Plaintiff Carpe's, Plaintiff Marzolf's, and the California Subclass Members' right to privacy, as well as by violating the statutory counts alleged herein.

203.   Defendants violated the unfair prong of the UCL by:

a) Using the ACR Tool to record and transmit the sensitive communications made by and to Plaintiff Garcia DeBolt, Plaintiff

**51**
**CLASS ACTION COMPLAINT**

Castello, Plaintiff Carpe, Plaintiff Marzolf, and the California Subclass Members through their Sony TVs; and

b) Disclosing the sensitive communications made by and to Plaintiff Garcia DeBolt, Plaintiff Castello, Plaintiff Carpe, Plaintiff Marzolf, and the California Subclass Members through the Sony TVs to third parties, including Google and Twitter.

204. As a result of Defendants' violations of the UCL, Plaintiff Garcia DeBolt, Plaintiff Castello, Plaintiff Carpe, Plaintiff Marzolf, and the California Subclass Members have suffered the diminution of the value of their Sensitive Information, as alleged above.

205. As a result of Defendants' violation of the UCL, Plaintiff Garcia DeBolt, Plaintiff Castello, Plaintiff Carpe, Plaintiff Marzolf, and the California Subclass Members are entitled to injunctive relief, as well as restitution necessary to restore to them in interest any money or property, real or personal, acquired through Defendants' unfair competition practices.

## COUNT IX
## VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
### Wash. Rev. Code §§ 19.86.010, *et seq.*
### *(On Behalf of Plaintiff Dionne and the Washington Subclass)*

206. Plaintiff Dionne repeats and realleges the allegations contained in paragraphs 1 through 205 as if fully set forth herein.

**CLASS ACTION COMPLAINT**

207. Plaintiff Dionne is a "person," as defined by Wash. Rev. Code § 19.86.010(1).

208. Defendants are engaged in the "trade" of selling TVs, as defined by Wash. Rev. Code § 19.86.010(2).

209. The Sony TVs are "assets," as defined by Wash. Rev. Code § 19.86.010(3).

210. Wash. Rev. Code § 19.86.020 prohibits "unfair or deceptive practices in the conduct of any trade or commerce."

211. Defendants violated the Washington Consumer Protection Act by collecting, monetizing, and disclosing Plaintiff Dionne's and Washington Subclass Members' Sensitive Information, as detailed above, without their knowledge or consent.

212. Defendants intended to mislead Plaintiff Dionne and the Washington Subclass Members and intended to induce Plaintiff Dionne and the Washington Subclass Members to rely on its misrepresentations and omissions.

213. Plaintiff Dionne and the Washington Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages equal to three times the value of the consideration given by them to Defendants, and attorneys' fees, filing fees, and costs

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of other Class Members, pray for judgment against Defendants as follows:

A.     an Order certifying the Nationwide Class, and Pennsylvania, Georgia, California, Washington, and Illinois Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B.     equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Information of Plaintiffs and Class Members;

C.     injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.     an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.     an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.     prejudgment interest on all amounts awarded; and

G.     all such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: January 16, 2026         Respectfully submitted,

*/s/ Catherine E. Ybarra*
Catherine E. Ybarra (SBN # 283360)
cybarra@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Telephone: (213) 297-3807

**CLASS ACTION COMPLAINT**

Tyler J. Bean*
Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

*pro hac vice admission anticipated*

**CLASS ACTION COMPLAINT**