Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109

[Additional counsel listed on signature page]
*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**CARMEN RUDNICK, BOBI HINESMAN, DEBBIE GARCIA DEBOLT, CHRISTINE DIONNE, ROBINE SHINE, LISA CASTELLO, RICHARD CARPE, WILLIS MARZOLF, GARIEL FREUND, LATISHA RICHMOND, JOANNA SEMONIOUS,** and **NANCY POWELL,** individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

**SONY ELECTRONICS INC.,**

*Defendant*.

Case No.: 3:26-cv-00297-H-JAC

**CONSOLIDATED CLASS ACTION COMPLAINT FOR PUBLIC INJUNCTION, DAMAGES, AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

Plaintiffs Carmen Rudnick, Bobi Hinesman, Debbie Garcia DeBolt, Christine Dionne, Robine Shine, Lisa Castello, Richard Carpe, Willis Marzolf, Gariel Freund, LaTisha Richmond, Joanna Semonious, and Nancy Powell (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows against Defendant Sony Electronics Inc. ("Sony" or "Defendant"):

## I. INTRODUCTION

1. Every few milliseconds, in millions of American homes, a Sony Smart television ("Sony Smart TV") captures a digital fingerprint of every sound and image displayed on its screen and transmits that fingerprint, along with persistent identifiers tied to the household, the device, and the home network, to Defendant and to a network of advertising-technology companies. This case is about Defendant's use of Automatic Content Recognition ("ACR") technology to engage in that conduct, the laws Defendant violates by doing so, and the years of public warnings about Smart TV ACR surveillance that Defendant has disregarded in continuing to engage in it. Plaintiffs bring this consumer-privacy and consumer-protection class action under federal and state law to redress Defendant's invasion of Plaintiffs' privacy and Defendant's interception, disclosure, and monetization of Plaintiffs' communications and personal information without informed consent.

2. Defendant's ACR data-collection conduct is not the product of inadvertence or ignorance. Defendant has knowingly continued, expanded, and deepened that conduct over many years, despite a documented sequence of public regulatory, law-enforcement, and academic warnings that put Defendant squarely on notice that the conduct is unlawful.

3. In 2017, the Federal Trade Commission and the New Jersey Attorney General obtained a $2.2 million settlement from Vizio, Inc. for the same kind of undisclosed Smart TV ACR data-collection conduct alleged here. *See United States*

*v. VIZIO, Inc.*, No. 2:17-cv-00758 (D.N.J.). Defendant nonetheless initiated, and continues to operate, its own ACR data-collection program on Sony Smart TVs.

4. Defendant's principal ACR vendor for most of the relevant period has been Samba TV, Inc. ("Samba TV"), whose ACR technology is embedded in and operated through Sony Smart TVs pursuant to Defendant's commercial relationship with Samba TV.

5. Despite these clear signals to cease its invasion of Americans' privacy in their own homes, as of the filing of this Complaint, Defendant continues to operate its ACR pipeline on millions of Sony Smart TVs in the United States, including those owned by Plaintiffs and Class Members.

6. The viewing data and persistent identifiers Defendant captures from each Sony Smart TV are transmitted in real time and near-real time to Defendant and to a network of corporate recipients, including Samba TV (Defendant's ACR vendor) and Google LLC (in connection with Sony Smart TVs running the Google TV operating system). Each such recipient independently captures, processes, and uses Plaintiffs' and Class Members' intercepted communications and identifiers to construct cross-device household identity graphs, target individual consumers across devices for advertising, and resell the resulting audience products to advertisers, agencies, data brokers, and identity-resolution providers. Each recipient is a separate corporate person, distinct from Defendant.

7. Defendant's underlying business model is the same model prosecuted by the FTC and the New Jersey Attorney General in 2017: sell televisions at competitive prices and recoup margin (and then some) by surreptitiously monetizing the viewing behavior of the consumers who buy them. By 2021, public reporting indicated that Vizio earned more in profit from the sale of ACR-derived viewer data than from the sale of its televisions themselves. Defendant's ACR practices are materially the same as the practices for which Vizio was sanctioned.

8. Defendant does not obtain its customers' informed consent to this surveillance. On the contrary, Defendant actively conceals the existence, scope, and operation of the ACR data collection behind benign-sounding feature names and dense, multi-screen setup flows; enables the data collection by default or through pre-checked, dark-pattern interfaces; and buries any opt-out controls.

9. Plaintiffs are twelve consumers who, individually and on behalf of similarly situated consumers, bring this action to redress Defendant's unlawful conduct. Each Plaintiff purchased and used a Sony Smart TV in his or her home, and each had his or her viewing communications and persistent identifiers ("Sensitive Information") intercepted, recorded, transmitted, and disclosed by Defendant's ACR pipeline ("ACR Tools") without informed consent.

10. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties; (iii) loss of the benefit of the bargain; (iv) diminution in the value of, and loss of the ability to control, their Sensitive Information; (v) statutory damages where applicable; and (vi) continued and ongoing risk to their Sensitive Information.

11. Therefore, Plaintiffs seek, on behalf of themselves and a Class of similarly situated persons, to remedy these harms and to assert claims against Defendant for invasion of privacy (intrusion upon seclusion and public disclosure of private facts), invasion of privacy in violation of the California Constitution, violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and 638.50—638.51, violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq*., violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, common-law negligence, violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code

§ 17200, *et seq*., violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1780(a)(2), common-law unjust enrichment, violations of Washington, Illinois, and Pennsylvania consumer protection statutes, and a public injunction on behalf of the general public under California law.

## II. THE PARTIES

12. **Plaintiff Carmen Rudnick** is a resident and citizen of Chester County, Pennsylvania. Plaintiff Rudnick purchased a Sony Smart TV (Model No. K-65XR70CB) in approximately February 2022 and personally set it up, and she has used it regularly since then in her home in Pennsylvania, where members of her household, including her husband and her three minor children, use the television to view television programs, stream video content, stream music, and play video games, including through Hulu, YouTube, Tubi, Paramount+, Disney+, Pluto TV, Spotify, Netflix, HBO Max, Peacock and Amazon Prime.

13. At all times relevant, Plaintiff Rudnick has maintained a Google account.

14. At no time was Plaintiff Rudnick presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

15. Unbeknownst to Plaintiff Rudnick, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to

analyze, make inferences about, and monetize her behavior, and Plaintiff Rudnick never consented to that conduct.

16. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Rudnick would not have purchased the Sony Smart TV, or would have paid substantially less for it.

17. **Plaintiff Bobi Hinesman** is a resident and citizen of Fulton County, Georgia. Plaintiff Hinesman purchased a Sony Smart TV (Model No. KD-50X80J) in approximately 2021 and has used it regularly since then in her home in Georgia. Members of her household, including her three children, use the television to view television programming provided by Comcast, stream video content from Disney+, Netflix, Amazon Prime, and YouTube, as well as to play video games on a PlayStation and an Xbox.

18. At the time Plaintiff Hinesman purchased the television, one of her children who used the television was under the age of 12. Plaintiff Hinesman has used her television to view, among other things, programs on the TLC network and medical TV shows, and her children have viewed programs including SpongeBob, One Punch Man, Sesame Street, and a YouTube series called The Ryan Show.

19. At all times relevant, Plaintiff Hinesman has maintained a Google account.

20. At no time was Plaintiff Hinesman presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

21. Unbeknownst to Plaintiff Hinesman, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her

household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Hinesman never consented to that conduct.

22. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Hinesman would not have purchased the Sony Smart TV, or would have paid substantially less for it.

23. **Plaintiff Debbie Garcia DeBolt** is a resident and citizen of Sacramento County, California. Plaintiff Garcia DeBolt purchased her first Sony Smart TV (Model No. K-85S30) in approximately November 2024 and a second Sony Smart TV (Model No. K-85S30C) in approximately October 2025, and has used them regularly since then in her home in California, where she and members of her household, including her husband, regularly use the televisions to view television programs and stream video content, including through Netflix.

24. Plaintiff Garcia DeBolt did not participate in the assembly, installation, or configuration of the Sony Smart TVs; those steps were performed by her husband.

25. At all times relevant, Plaintiff Garcia DeBolt has maintained a Google account.

26. At no time was Plaintiff Garcia DeBolt presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

27. Unbeknownst to Plaintiff Garcia DeBolt, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TVs, including every image displayed on her screen

and the television programming, streaming, and other video content she and her household viewed on the televisions as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Garcia DeBolt never consented to that conduct.

28. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Garcia DeBolt would not have purchased the Sony Smart TVs, or would have paid substantially less for them.

29. **Plaintiff Christine Dionne** is a resident and citizen of Clark County, Washington. Plaintiff Dionne purchased a Sony Smart TV (XR-65X90) in approximately 2022 and has used it regularly since then in her home in Washington, where she and members of her household, including her adult son and husband, regularly use the television to view video content, including through Netflix, Amazon Prime, and YouTube.

30. At all times relevant, Plaintiff Dionne has maintained a Google account.

31. Plaintiff Dionne did not participate in the assembly, installation, or configuration of the Sony Smart TV; those steps were performed by another member of her household.

32. At no time was Plaintiff Dionne presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

33. Unbeknownst to Plaintiff Dionne, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen

and the television programming, streaming, and other video content she and her household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Dionne never consented to that conduct.

34. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Dionne would not have purchased the Sony Smart TV, or would have paid substantially less for it.

35. **Plaintiff Robine Shine** is a resident and citizen of McHenry County, Illinois. Plaintiff Shine purchased a Sony Smart TV (Model No. XBR-75X850F) in approximately November 2018 and has used it regularly since then in her home in Illinois, where she and members of her household, including her husband and minor grand-niece, have used the television from the purchase date through the present to watch television programming and stream video content, including FOX and NBC news programming, series such as 'Tulsa' and 'Euphoria', motor sports events, and streaming content on Amazon Prime, Peacock, YouTube, HBO Max and Netflix,

36. At all times relevant, Plaintiff Shine has maintained a Google account.

37. At no time was Plaintiff Shine presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

38. Unbeknownst to Plaintiff Shine, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her household viewed on

the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Shine never consented to that conduct.

39. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Shine would not have purchased the Sony Smart TV, or would have paid substantially less for it.

40. **Plaintiff Lisa Castello** is a resident and citizen of San Luis Obispo County, California. Plaintiff Castello purchased a Sony Smart TV (Model No. K-65XR70) in approximately May 2025 and has used it regularly since then in her home in California, where she and members of her household regularly use the television to view video content, including through Netflix, Apple TV, Paramount+, and YouTube.

41. At all times relevant, Plaintiff Castello has maintained a Google account.

42. Plaintiff Castello did not participate in the assembly, installation, or configuration of the Sony Smart TV; those steps were performed by an installation professional.

43. At no time was Plaintiff Castello presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

44. Unbeknownst to Plaintiff Castello, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her

household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Castello never consented to that conduct.

45. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Castello would not have purchased the Sony Smart TV, or would have paid substantially less for it.

46. **Plaintiff Richard Carpe** is a 77-year-old resident and citizen of Orange County, California and is a "senior citizen" within the meaning of California Civil Code § 1761(f).

47. Plaintiff Carpe purchased a Sony Smart TV (Model No. XBR-49X800E) from Best Buy in approximately 2019 and has used it regularly since then in his home in California.

48. At all times relevant, Plaintiff Carpe has maintained a Google account.

49. Plaintiff Carpe did not participate in the assembly, installation, or configuration of the Sony Smart TV, those steps were performed by an installation professional from Best Buy.

50. The television is now used by Plaintiff Carpe and his 74-year-old spouse to watch cable television and to stream video content.

51. At no time was Plaintiff Carpe presented with, or did he knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of his viewing activity or associated data.

52. Unbeknownst to Plaintiff Carpe, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed his Sensitive Information during his use of the

Sony Smart TV, including every image displayed on his screen and the television programming, streaming, and other video content he and his household viewed on the television as described above, throughout the period of his ownership and use. This content communicated his likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of him to analyze, make inferences about, and monetize his behavior, and Plaintiff Carpe never consented to that conduct.

53. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Carpe would not have purchased the Sony Smart TV, or would have paid substantially less for it.

54. **Plaintiff Willis Marzolf** is a resident and citizen of San Joaquin County, California. Plaintiff Marzolf purchased a Sony Smart TV (Model No. XR-77A80K) in approximately September 2022 and personally set it up, and has used it regularly since then in his home in California to watch television programming, including pay-per-view films, football games, HBO Max, Netflix, Prime, Hallmark, Starz, and Tubi.

55. At all times relevant, Plaintiff Marzolf has maintained a Google account.

56. At no time was Plaintiff Marzolf presented with, or did he knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of his viewing activity or associated data.

57. Unbeknownst to Plaintiff Marzolf, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed his Sensitive Information during his use of the Sony Smart TV, including every image displayed on his screen and the television programming, streaming, and other video content he and his household viewed on the television as described above, throughout the period of his ownership and use. This content communicated his likes, dislikes, interests, and

habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of him to analyze, make inferences about, and monetize his behavior, and Plaintiff Marzolf never consented to that conduct.

58. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Marzolf would not have purchased the Sony Smart TV, or would have paid substantially less for it.

59. **Plaintiff Gariel Freund** is a resident and citizen of San Francisco, San Francisco County, California. Plaintiff Freund purchased a Sony Smart TV (Model No. K-55S30) in approximately 2024 and personally set it up, and has used it regularly since then in his home in San Francisco, where he and another adult member of his household use the television to view streaming video content, including political shows such as CNN News, Lawrence O'Donnell, and Kaitlen Collins, network programing such as the Today Show, ABC Morning, and 60 Minutes, shows such as NCIS and soup operas, and sports programming such as NFL, NBA, WNBA, college football. Plaintiff Freund views these programs on his Sony Smart TV through services such as HBO Max, Netflix, Amazon Prime Video, Hulu, ESPN+ Paramount+, and Peacock. Plaintiff Freund watches his Sony Smart TV at least 4-5 hours approximately every day.

60. At no time was Plaintiff Freund presented with, or did he knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of his viewing activity or associated data.

61. Unbeknownst to Plaintiff Freund, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed his Sensitive Information during his use of the Sony Smart TV, including every image displayed on his screen and the television programming, streaming, and other video content he and his

household viewed on the television as described above, throughout the period of his ownership and use. This content communicated his likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of him to analyze, make inferences about, and monetize his behavior, and Plaintiff Freund never consented to that conduct.

62. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Freund would not have purchased the Sony Smart TV, or would have paid substantially less for it.

63. **Plaintiff LaTisha Richmond** is a resident and citizen of Suisun City, Solano County, California. Plaintiff Richmond purchased a Sony Smart TV (Model No. XBR-75X850F) and personally set it up, and she has used it regularly since then in her home in Suisun City, where members of her household, including minor children, use the television to view streaming video content, including through services such as Netflix, Tubi, and Peacock and including TV programming such as Love Island, and soccer and NFL games.

64. At all times relevant, Plaintiff Richmond has maintained a Google account, including Gmail.

65. At no time was Plaintiff Richmond presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

66. Unbeknownst to Plaintiff Richmond, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her household viewed on the television as described above, throughout the period of her

ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Richmond never consented to that conduct.

67. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Richmond would not have purchased the Sony Smart TV, or would have paid substantially less for it.

68. **Plaintiff Joanna Semonious** is a resident and citizen of Tehachapi, Kern County, California. Plaintiff Semonious purchased a Sony Smart TV (Model No. 75X900F) in approximately 2018 and has used it regularly since then in her home in Tehachapi, where she and members of her household, including minor grandchildren, regularly use the television to view streaming and other video content.

69. Plaintiff Semonious did not participate in the assembly, installation, or configuration of the Sony Smart TV; those steps were performed by another member of her household. At no time was Plaintiff Semonious presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

70. Unbeknownst to Plaintiff Semonious, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to

analyze, make inferences about, and monetize her behavior, and Plaintiff Semonious never consented to that conduct.

71. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Semonious would not have purchased the Sony Smart TV, or would have paid substantially less for it.

72. **Plaintiff Nancy Powell** is a resident and citizen of Modesto, Stanislaus County, California. Plaintiff Powell purchased a Sony Smart TV (Model No. XR65X90L) from Best Buy in July 2023 and has used it regularly since then in her home in Modesto, where she and at least one other adult use the television to view streaming and cable content, including political shows, local and national news, romance shows, sitcoms, documentaries on a variety of topics, and true crime shows. Most of Plaintiff Powell's television viewing is through her Xfinity cable account and streaming services including Netflix, HBO, Hulu, Disney+, Paramount+, Prime Video, and WyaTV. Plaintiff Powell's television is on for viewing between an average of approximately 12 to 14 hours per day.

73. At the time of her purchase, Plaintiff Powell was over the age of 65 and is a "senior citizen" within the meaning of California Civil Code § 1761(f).

74. Plaintiff Powell did not participate in the assembly, installation, or configuration of the Sony Smart TV; those steps were performed by a third party installation professional, the Geek Squad.

75. At no time was Plaintiff Powell presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

76. At all times relevant, Plaintiff Powell has maintained a Google account, including Gmail.

77. Unbeknownst to Plaintiff Powell, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Sony Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties including Samba TV to create, an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Powell never consented to that conduct.

78. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Powell would not have purchased the Sony Smart TV, or would have paid substantially less for it.

79. Each named Plaintiff continues to own and use his or her Sony Smart TV, which remains operational and connected, such that each Plaintiff's viewing activity and associated identifiers remain subject to Defendant's ongoing, continuous ACR interception, collection, transmission, and disclosure. Absent injunctive relief, Defendant's unlawful conduct will continue to capture and disclose Plaintiffs' Sensitive Information, and Plaintiffs therefore face a real and immediate threat of continuing and future injury that monetary damages cannot remedy.

80. **Defendant Sony Electronics Inc.** ("Sony" or "Defendant") is a corporation organized under the laws of Delaware, with its principal place of business at 16535 Via Esprillo, San Diego, California 92127, in San Diego County. Defendant designs and manufactures Sony Smart TVs and other consumer electronics, and markets, distributes, and sells them throughout the United States, including throughout California and within this District, and configures and operates the ACR

data-collection functionality embedded in Sony Smart TVs, including through its commercial relationship with its ACR vendor, Samba TV.

81. Defendant operates and profits from the ACR data-collection program described in this Complaint and is responsible for the design, configuration, and ongoing operational support of the ACR functionality on Sony Smart TVs.

## III. JURISDICTION AND VENUE

82. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class contains more than 100 members; and minimal diversity exists because at least one Class Member is a citizen of a state different from Defendant.

83. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the VPPA, 18 U.S.C. § 2710, and the ECPA, 18 U.S.C. § 2510 *et seq*.

84. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same common nucleus of operative facts as the federal claims.

85. This Court has personal jurisdiction over Defendant Sony Electronics Inc. because it has purposefully availed itself of the privilege of conducting business in California and within this District. Defendant designs, markets, distributes, and sell millions of Sony Smart TVs to California residents through nationwide retailers (including Amazon, Best Buy, Costco, Sam's Club, Target, and Walmart) and through e-commerce channels directed at California consumers; it remotely delivers firmware, software, and over-the-air updates to Smart TVs operating in this District; and it continuously and systematically intercepts, collects, transmits, and monetizes data from Sony Smart TVs located in this District. Defendant's alleged tortious and

statutory violations were expressly aimed at, occurred within, and caused harm in this District.

86. Defendant designs, manufactures, markets, distributes, and sells Smart TVs throughout California, including within this District.

87. Defendant derives substantial revenue from the sale of Smart TVs in California and from the monetization of consumer data collected from those devices.

88. Defendant also directs advertising, software updates, and data collection services toward Smart TVs located in California, including those owned by Plaintiffs and members of the proposed Class.

89. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

90. Specifically, Sony Smart TVs equipped with ACR technology were sold, installed, and used by consumers within this District.

91. The unlawful collection and transmission of viewing data described in this Complaint occurred on devices located within this District.

92. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District, Defendant's principal place of business is located in San Diego County within this District, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. ARTICLE III STANDING

93. Each named Plaintiff has Article III standing to bring the claims asserted herein. Each Plaintiff has suffered a concrete and particularized injury-in-fact that is fairly traceable to Defendant's conduct and that is redressable by a favorable judicial decision. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

94. First, each Plaintiff has suffered an actual, concrete invasion of privacy—the kind of harm that has long been recognized as actionable both at common law and under California and federal statutory law. The interception, recording, real-time disclosure, identification, and re-distribution of an individual's in-home audiovisual viewing communications by an internet-connected Smart TV is precisely the sort of intrusion that the common-law privacy torts of intrusion upon seclusion and public disclosure of private facts, the California Constitution's right of privacy (Art. I, § 1), the California Invasion of Privacy Act, the federal Wiretap Act, and the Video Privacy Protection Act were enacted to address. *See TransUnion*, 594 U.S. at 425 (intangible harms with "a close historical or common-law analogue" satisfy concreteness).

95. Second, each Plaintiff has suffered a loss of control over his or her personal information and a diminution in its value. Defendant's ACR pipeline captured each Plaintiff's household-level identifiers, IP addresses, device and advertising identifiers, and viewing-behavior data, and disclosed that information to third parties, depriving each Plaintiff of the ability to control or monetize his or her own data and injecting it into proprietary identity graphs from which Plaintiffs are excluded.

96. Third, each Plaintiff has suffered economic injury, including (i) the loss of the benefit of the bargain (Plaintiffs would not have purchased their Sony Smart TVs at the prices paid, and on information and belief would have paid less or nothing at all, had Defendant disclosed the true nature, scope, and downstream uses of the ACR-derived data collection at the point of sale) and (ii) the diminution in value of, and loss of ability to control or monetize, their personal information.

97. In addition, Defendant's ACR conduct imposes an ongoing, out-of-pocket cost on each Plaintiff. Because the ACR functionality captures, processes, and transmits fingerprints whenever the television displays content, it continuously draws

metered electricity that each Plaintiff pays for at a per-kilowatt-hour rate—consuming, upon information and belief, on the order of a kilowatt hour per television each year for the ACR surveillance itself—so that each Plaintiff pays, without knowledge or consent, for the electricity used to invade his or her privacy.

98. Fourth, where applicable, each Plaintiff is entitled to statutory damages under CIPA (Cal. Penal Code § 637.2 ($5,000 per violation)), the federal Wiretap Act (18 U.S.C. § 2520(c)(2)), the VPPA (18 U.S.C. § 2710(c)(2)), and the CDAFA (Cal. Penal Code § 502(e)). Statutory-damages remedies for the intangible privacy injuries of the kind asserted here independently confer Article III standing under *TransUnion* and its progeny.

99. Nothing in Section 230 of the Communications Decency Act, 47 U.S.C. § 230, immunizes any of the conduct alleged here. Section 230 protects interactive computer service providers from being treated as the publishers or speakers of third-party content. Plaintiffs do not seek to hold Defendant liable as publishers or speakers of third-party content; they seek to hold Defendant liable for its own first-party conduct in designing, configuring, and operating Sony Smart TVs and the ACR systems embedded therein, capturing and re-distributing Plaintiffs' in-home audiovisual viewing communications and associated identifiers, and doing so without informed consent and in violation of federal and California law. The Ninth Circuit has repeatedly held that § 230 does not immunize defendants from liability for their own first-party data-collection and data-disclosure conduct.

## V. SONY'S SMART TV BUSINESS

100. Sony manufactures Smart TVs and sells them in the United States under the Sony Smart TV brand, including the BRAVIA brand.

101. Defendant's Smart TVs are internet-connected devices capable of running streaming applications, connecting to external media devices, and interacting with other smart devices within a consumer's home.

102. Sony markets these televisions as convenient, centralized platforms for accessing digital media and streaming services.

103. Sony sells millions of Smart TVs in the United States each year and has placed such devices in millions of American households.

104. Because televisions are typically located in shared household spaces—such as living rooms and bedrooms—a single Sony Smart TV is regularly used by multiple individuals within a household, including family members and guests.

105. As a result, each Sony Smart TV provides Sony with access to detailed behavioral and viewing information concerning multiple individuals within the same household.

106. This household-level surveillance allows Sony to collect and monetize viewing data not only from the purchaser of the television, but from all individuals who use it—regardless of whether those individuals received notice of or consented to such data collection.

## VI. AUTOMATIC CONTENT RECOGNITION TECHNOLOGY

107. Automatic Content Recognition (ACR) is a technology designed to identify what media content is displayed on a television.

108. ACR operates by continuously capturing portions of the audio and video output from the television and converting those fragments into unique digital "fingerprints."

109. The identified viewing data is then transmitted to remote servers, where it is aggregated, analyzed, and linked to device- and household-level identifiers.




**Figure 1: Overview of ACR tracking in Smart TVs**
*Source*: Gianluca Anselmi et al., *Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs* (Sept. 10, 2024), arxiv.org/html/2409.06203v1.

110. Federal regulators have likewise long recognized the deceptive and unfair nature of undisclosed ACR data collection. In February 2017, the Federal Trade Commission and the New Jersey Attorney General announced a $2.2 million settlement with Vizio, Inc. arising from Vizio's collection of viewing data on approximately 11 million Vizio Smart TVs through ACR technology without consumers' informed consent. *See United States v. VIZIO, Inc.*, No. 2:17-cv-00758 (D.N.J.). The FTC found that Vizio used the ACR data to build "highly specific viewing-behavior databases" and shared those databases with third parties for advertising and analytics purposes. By 2021, public reporting indicated that Vizio earned more in profit from the sale of ACR-derived viewer data than from the sale of its televisions themselves. Defendant's ACR practices are materially the same as the

practices for which Vizio was sanctioned, and Defendant's business model—selling televisions at competitive prices and recouping margin through the monetization of consumer ACR data—is the same business model that the FTC and the New Jersey Attorney General determined to be unlawful and unfair.

## VII. SONY'S ACR SURVEILLANCE PROGRAM

111. Sony has incorporated ACR technology into its Smart TVs since at least 2017, when it began shipping Sony Smart TVs with Samba TV's ACR functionality enabled without informed consent.

112. Defendant implements this ACR functionality through ACR software and firmware operated by Defendant and by its ACR vendor, Samba TV, on Sony Smart TVs. Sony Smart TVs run the Google TV operating system. The ACR system continuously captures fingerprints of the audiovisual content displayed on the screen—covering content from antenna and cable sources, HDMI inputs, and streaming applications—transmits those fingerprints to servers controlled by Defendant and/or Samba TV in real time and near-real time, matches them against a reference database to identify the specific content viewed, and associates that viewing activity with persistent identifiers tied to the television and household. In addition, Sony Smart TVs running Google TV are configured to transmit to Google, in real time, the device's Google Advertising Identifier, signed-in Google account activity, application telemetry, and household and device identifiers, which Google incorporates into its identity- and audience-resolution infrastructure.

113. Within Sony Smart TVs, this ACR functionality is presented to consumers during device setup and in subsequent menus under benign-sounding labels that do not communicate that the feature operates as continuous, frame-by-frame surveillance of every sound and image displayed on the consumer's television.

114. Sony describes this feature as providing personalization, recommendations, or enhanced viewing experiences.

115. In reality, the feature operates as a continuous surveillance mechanism that monitors and records the media displayed on the television.

116. When enabled, Defendant's ACR system continuously captures audio and video data from the television screen during ordinary use.

117. The system identifies the content being displayed and records detailed information about each viewing session.

118. This data includes, but is not limited to:

- the specific programs and videos watched;
- the advertisements viewed;
- the applications used;
- the timing and duration of viewing sessions; and
- information about devices connected to the television.

119. Sony aggregates this data to create household-level viewing profiles.

120. These profiles are used by Sony and its advertising partners to deliver targeted advertising across televisions and other connected devices.

## VIII. SONY'S COLLECTION OF HIGHLY SENSITIVE VIEWING DATA

121. The viewing information captured through Defendant's ACR system is highly sensitive and revealing.

122. For example, viewing behavior can reveal information relating to:

- political preferences and affiliations;
- religious beliefs and practices;
- sexual orientation;
- health conditions and medical concerns;
- family composition, including the presence and ages of children; and
- age, socioeconomic status, and other demographic characteristics.

123. Sony aggregates this viewing data into consumer profiles used for targeted advertising and behavioral segmentation.

124. These profiles are linked to persistent identifiers and are associated with identifiers tied to other devices belonging to the same individual or household.

125. Through this linkage, Sony correlates viewing activity from Smart TVs with data collected from smartphones, tablets, and computers.

126. This cross-device tracking enables Sony and its advertising partners to construct detailed identity graphs and comprehensive behavioral profiles of consumers across contexts and devices.

127. The Sensitive Information collected and derived through Defendant's ACR data-collection conduct alleged in this Complaint thus includes, but is not limited to: (i) the specific audiovisual content displayed on Plaintiffs' and Class Members' Sony Smart TVs, including the programs, episodes, advertisements, applications, and external-input content (e.g., from HDMI-connected gaming consoles, Blu-ray players, streaming sticks, and personal computers) viewed; (ii) device-level and network identifiers tied to those Sony Smart TVs, including IP address, MAC address, advertising identifier, household identifier, and operating-system identifier; (iii) cross-device identifiers and linkages associating those Sony Smart TVs with other devices used in the same household or by the same individual user (including smartphones, tablets, and computers); (iv) timestamped logs of viewing activity and device usage; and (v) inferences drawn from the foregoing, including inferences regarding consumers' interests, habits, preferences, household composition, demographics, lifestyle, and other personal characteristics.

## IX. SAMBA TV'S ACR AND IDENTITY-GRAPH BUSINESS ON SONY SMART TVS

128. Samba TV, Inc. is a U.S. company that has embedded its ACR technology in Smart TVs since at least 2011 and operates an ACR, advertising-technology, and identity-resolution platform. Defendant has integrated Samba TV's ACR technology into Sony Smart TVs as its principal ACR vendor for most of the

relevant period. Samba TV's patented ACR technology uses video fingerprinting and machine learning to accurately identify the content a viewer is watching on the Sony Smart TV.

129. Samba TV delivers its ACR technology through componentry embedded in the Sony Smart TV's hardware and firmware—what Samba TV refers to as its "chip set"—which has been built into popular Smart TVs since 2011. That embedded chip set and firmware function as the physical "anchor" of Samba TV's identity-resolution system: through it, Samba TV intercepts viewing data and unique device identifiers directly from the Sony Smart TV, which is how Samba TV begins to identify which specific users are interacting with the television and their separate individual devices.

130. Samba TV developed its identity-resolution products in deliberate response to industry-wide efforts to curb privacy-invasive tracking. Beginning in the early 2010s, Apple discontinued developer access to the "UDID," a permanent device identifier, because it was privacy-intrusive and could not be reset. Over the following decade, Apple and Google announced the deprecation of mobile advertising identifiers—such as the IDFA and the Android Advertising ID—and web browsers moved to block third-party cookies, in favor of more privacy-preserving mechanisms; Apple also introduced "Do Not Track" and App Tracking Transparency controls that let consumers prevent the collection of their advertising identifiers. Samba TV created SambaID and its Identity Graph specifically to fill the gap left by the loss of those identifiers—to continue identifying and tracking individuals at the user level after the tools that consumers could see, reset, or block had been curtailed.

131. Samba TV understood that tracking individuals in this manner raises serious privacy concerns. Samba TV's own Senior Vice President and Head of Data Products acknowledged in 2021 that "[r]eaching individuals is fraught with privacy implications," and Samba TV's co-founder and Chief Executive Officer described

advertisers' need for an identifier "that will survive the death of cookies." Notwithstanding its recognition of these privacy implications, Samba TV built and deployed SambaID to track consumers at the individual level, and it markets its Identity Graph and SambaID as "future proof" and adaptable to "ever-changing privacy regulations."

132. Samba TV's ACR system is enabled on Sony Smart TVs and operates through software and components embedded in the device. The ACR system captures audiovisual content displayed on the television screen, generates fingerprints of that content, and transmits the fingerprints, together with persistent identifiers, to servers controlled by Defendant and/or Samba TV in real time.

133. Beyond the video fingerprints themselves Samba TV's ACR technology intercepts more than two dozen additional metadata fields from each Sony Smart TV, including geolocation information, the channel and subchannel being viewed, the volume percentage, whether the television is muted, and the screen width and height. Using this data, Samba TV can identify the exact movie, program, episode, advertisement, or video game displayed on the screen—regardless of whether the content originates from a cable or satellite network, a streaming service, or a connected video-game console—and processes that content in real time, often within seconds. Using artificial intelligence, Samba TV further analyzes the second-by-second on-screen metadata it captures to identify the actors, music, visual descriptions, and objects depicted in the content the consumer views.

134. Samba TV's ACR technology is incorporated across a broad range of Sony Smart TV models and model families, including the model families of the Sony Smart TVs owned by Plaintiffs. These include the Sony X80/X800 series (such as the KD-50X80J owned by Plaintiff Hinesman and the XBR-49X800E owned by Plaintiff Carpe); the X850 series (such as the XBR-75X850F owned by Plaintiffs Shine and Richmond); the X900 and X90 series (such as the 75X900F owned by

Plaintiff Semonious, the XR-65X90 owned by Plaintiff Dionne, and the XR65X90L owned by Plaintiff Powell); the A80 OLED series (such as the XR-77A80K owned by Plaintiff Marzolf); the S30 series (such as the K-55S30 owned by Plaintiff Freund and the K-85S30 and K-85S30C owned by Plaintiff Garcia DeBolt); and the XR70 series (such as the K-65XR70 owned by Plaintiff Castello); among other current and legacy Sony BRAVIA model families. The Sony Smart TVs owned by Plaintiffs are within the model families on which Samba TV's ACR technology operates.

135. Defendant and Samba TV ingest the resulting ACR data into an identity-graph and advertising-technology platform. Samba TV uses probabilistic and deterministic algorithms to match signals—including IP address and operating-system information—from the Sony Smart TV to the consumer's other devices, such as smartphones, tablets, and computers, in order to identify which devices belong to which specific individuals, and assigns a persistent, proprietary universal identifier—the "SambaID"—to each individual and each of his or her devices, which Defendant and Samba TV use to enable cross-device tracking and advertising. Defendant and Samba TV use the SambaID, IP address, MAC address, and other persistent identifiers to construct cross-device household identity graphs that link Sony Smart TVs to the other devices used in the same household.

136. Samba TV's SambaID and Identity Graph are built on proprietary cross-device technology that Samba TV acquired in 2019. That technology processes more than a dozen signals from each device—including IP address, device identifier, timestamp, operating system, and hardware information—and uses deterministic and probabilistic algorithms to match those signals to the other devices that share them, such as smartphones, tablets, and computers, in order to determine which specific devices are owned and used by the same individual and household. The ACR technology embedded in the Sony Smart TV serves as the "anchor" for this identity-resolution system.

137. Through the ACR functionality on Sony Smart TVs, Defendant and Samba TV intercept unique identifiers associated with the device and household, including the IP address, GUID, Android ID/UUID, advertising identifier (AAID), SessionID, SDADID, and SMID, and supplement those identifiers with additional identifying information obtained from advertisers and partners, including SHA-256 hashed email addresses, mobile advertising identifiers, and connected-television device identifiers. Defendant and Samba TV intercept each Plaintiff's private video-viewing data in real time—including what the consumer watches on cable and streaming services—and tie that data to the identifiers, including the SambaID, associated with that consumer, using the resulting data to facilitate targeted advertising and to place consumers in custom audiences and Samba TV's panel products.

138. The purpose and effect of this architecture is to identify and track *specific individuals*, not merely devices. By matching the signals it intercepts from the Sony Smart TV against signals from a consumer's other devices, *Samba TV determines which devices belong to which particular person* and household and ties them to that individual's persistent SambaID. Samba TV further "bridges" the viewing data it captures from Sony Smart TVs with data it obtains from advertisers and other partners—who, together with Samba TV, already maintain extensive data on individuals—combining those datasets to enrich each individual's profile and to enable more advanced cross-device targeting, measurement, and optimization. As Samba TV explains, by "leverag[ing] a multi-identifier approach, using various types of digital identifiers as well as first party TV data[, Samba TV's ACR software] can identify at 90%+ accuracy which phones, tablets, PCs, and TVs belong to an

individual[.]"[1] As a result, Sony and Samba are able to coordinate advertising delivered on a consumer's ACR-enabled television with advertising delivered on the user's other devices, such as a second screen being used by the user simultaneously while watching a Sony TV.[2]

139. Samba TV's Identity Graph software is remarkably accurate: Samba TV estimates that by "leverag[ing] a multi-identifier approach, using various types of digital identifiers as well as first party TV data[, Samba] can identify at 90%+ accuracy which phones, tablets, PCs, and TVs belong to an individual[.]"[3]

140. As soon as a consumer sets up a Sony Smart TV, Samba TV assigns the device a globally unique identifier (a "GUID"). Samba TV sets that GUID by first checking for a specific identifier set by the television manufacturer—here, Sony—and, if none is available, by setting the GUID to a hashed version of the device's Android ID (intercepted as a "UUID"). Both the GUID and the Android ID/UUID persist across reboots and application updates, as does the IP address Samba TV intercepts. None of the data Samba TV intercepts through its ACR technology on Sony Smart TVs is deidentified, anonymized, or aggregated.

141. Samba TV also tracks discrete viewing "sessions" on each Sony Smart TV, intercepting for each session the GUID, the Android ID/UUID, the AAID, and timestamps, together with session identifiers ("tvSessionId" and "lastTVSessionId") derived by hashing the Android ID/UUID with a timestamp, which enables long-term tracking of each consumer's specific viewing activity. Samba TV further constructs

---

[1] *Bridge datasets in the evolving identity world*, SAMBA TV, https://www.samba.tv/business/identity (last accessed Jan. 6, 2026).

[2] *See Understanding Video-based Automatic Content Recognition*, SAMBA TV, at 9, *available online at*: https://www.samba.tv/resources/understanding-video-based-automatic-content-recognition-acr.

[3] *Bridge datasets in the evolving identity world*, SAMBA TV, https://www.samba.tv/business/identity (last accessed Jan. 6, 2026).

fingerprint maps and enriches them with device metadata, including the platform, make, model identifier, firmware version, device name, device language, brand, and model year of the Sony Smart TV.

142. The data-collection identifiers Samba TV assigns to Sony Smart TVs cannot meaningfully be disabled by consumers. Even if a consumer located and used the setting represented to "reset" or "clear" the device advertising identifier, that action would reset only the AAID and Samba TV's SDADID; it would have no effect on the GUID or the Android ID/UUID, which continue to identify the device and are transmitted together with the reset identifiers. As a result, *the opt-out controls Defendant and Samba TV represent as available to consumers are illusory*.

143. Samba TV also transmits data directly from the Sony Smart TV to Mixpanel, Inc., a separate third party, which receives both its own device identifier and the GUID—further extending the set of separate corporate recipients that obtain Plaintiffs' viewing-related data and associated identifiers.

144. Defendant and Samba TV monetize the resulting ACR-derived data and identity-graph outputs through targeted advertising, audience products, and licensing arrangements with brands, agencies, advertising-technology intermediaries, and data brokers. This commercial model is built around monetizing user-level viewing data, advertising-identifier data, and cross-device identity-graph products that originate, in substantial part, from ACR data captured on Sony Smart TVs.

145. Samba TV packages the identifiable data it derives from Sony Smart TVs—tied to the SambaID—into commercial products that it sells and licenses for profit. Among these is the "Samba Panel," which Samba TV markets as comparable to U.S. Census data, claiming that the individuals represented in it fall within a .00003% to .01% delta of U.S. Census figures for gender, ethnicity, age, and income. Samba TV also places individual consumers into "custom audiences" based on their viewing activity and the data Samba TV compiles about them, including audiences

reflecting political affinities (such as viewers with an affinity for "liberal" or "conservative" news and viewers of the State of the Union), religious observances, sexual orientation (such as audiences built from Pride Month programming), national origin and language (including audiences built from Chinese-Mandarin, Japanese, and Korean programming), and the specific video games consumers play (such as Skyrim, God of War, and the FIFA series).

146. Samba TV makes these audiences and the underlying viewing-derived data available to advertisers, publishers, data brokers, and ad-tech platforms—including FreeWheel, Google Ads, LiveRamp, The Trade Desk, and Yahoo—which can incorporate a given audience into their own accounts by copying a "Deal ID" into their platform of choice, and which Samba TV routinely refreshes so that recipients have access to the latest available audiences.

## X. GOOGLE'S AD-TECH AND IDENTITY-RESOLUTION SYSTEMS ON SONY SMART TVS

147. Sony Smart TVs running the Google TV operating system are configured to integrate with Google's ad-tech and identity-resolution systems, including Google Ads, Google Marketing Platform, Display & Video 360, and Google's cross-device identity graph. As configured, Sony Smart TVs transmit to Google, in real time and on a continuous basis during device use, the device's Google Advertising Identifier, signed-in Google account activity, application telemetry (including which applications are launched, the duration of in-app sessions, the search and recommendation queries entered into the Google TV launcher, and on-device interaction events), and household and device identifiers, which Google incorporates into its identity- and audience-resolution infrastructure, enabling Google to target individual users and households across devices and contexts.

## XI. SONY'S INTEGRATED ACR SURVEILLANCE ARCHITECTURE

148. Defendant's Sony Smart TVs and the ACR and identity-resolution platform of Samba TV (together with Google's ad-tech and identity-resolution systems on Sony Smart TVs running Google TV) operate together as an integrated surveillance and advertising architecture designed to capture, identify, and monetize consumers' in-home viewing activity.

149. Defendant and Samba TV match the ACR fingerprints captured from Sony Smart TVs to identify the viewed content and associate that information with device- and household-level identifiers, including IP address, MAC address, advertising identifier, and the SambaID, transmitting the resulting viewing data to servers controlled by Defendant and/or Samba TV. Google, for Sony Smart TVs running Google TV, receives, in real time, the device's advertising identifier, signed-in account activity, application telemetry, and household and device identifiers, which Google associates with its account- and device-level identity graph. The ACR transmissions and associated identifier transmissions include content- and identifier-derived information sufficient to identify the specific programs, advertisements, or audiovisual material viewed by Plaintiffs and Class Members and to attribute that viewing activity to particular households and devices in real time or near-real time.

150. Each of those operators integrates the captured ACR data into broader identity-resolution systems that link Sony Smart TVs to other devices associated with the same household or user, including smartphones, tablets, and computers, using deterministic and probabilistic matching techniques and identifiers obtained from third-party identity-resolution providers (such as LiveRamp), and demand-side and supply-side platforms.

151. Through these systems, Defendant and the third-party recipients create cross-device identity graphs that connect in-home television viewing activity with digital activity occurring on other devices and platforms, forming unified profiles that

persist over time and are updated as additional data is collected. This process results in the assignment or maintenance of persistent identifiers—whether internally defined or derived from combined signals—that function as stable reference points for tracking a household or user across devices and over time.

152. The Sony Smart TV serves as a primary data-collection endpoint—and the anchor of this identity-resolution architecture—capturing viewing activity from the "first screen" in the home. In sequence, Defendant and Samba TV (1) capture viewing data on the device, (2) convert it into identifiable signals, (3) transmit those signals to servers controlled by Defendant and/or Samba TV in real time or near-real time, (4) match them to known content, (5) associate them with persistent identifiers including the SambaID, (6) incorporate them into identity graphs used for advertising and analytics, and (7) re-distribute the resulting datasets to Samba TV, Google, and other downstream ad-tech, identity-graph, data-broker, and measurement partners as alleged herein.

153. Recent academic forensics support the existence and operational behavior of these data flows. In a 2024 ACM Internet Measurement Conference paper, researchers performed a black-box audit of the ACR network traffic generated by Smart TVs and confirmed that ACR-enabled Smart TVs continuously capture content displayed on the screen, generate fingerprints of that content, and transmit those fingerprints to ACR-vendor-controlled domains. They further found that ACR transmissions occurred even when the Smart TV was used as a "dumb" HDMI display for laptops, gaming consoles, and other personal devices, and that opting out of ACR features through the Smart TV's privacy menus stopped or substantially reduced network traffic to ACR-vendor servers.[4] The architectural pattern that

[4] *See* Gianluca Anselmi et al., Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs (Sept. 10, 2024), available at https://www.researchgate.net/publication/383917613_Watching_TV_with_the_

research documents—continuous on-device fingerprint generation; transmission to vendor-controlled servers; input-source-agnostic capture, including for HDMI sources—is the same architectural pattern that Defendant and Samba TV employ on Sony Smart TVs. Sony Smart TVs transmit ACR fingerprints and associated identifiers to Defendant- and Samba TV-controlled server endpoints in real time and near-real time during use. Plaintiffs reserve the right to identify the specific endpoints in discovery.

## XII. DEFENDANT'S REAL-TIME AND NEAR-REAL-TIME DISCLOSURE OF ACR DATA TO SAMBA TV, GOOGLE, AND OTHER DOWNSTREAM AD-TECH PARTNERS

154. **Samba TV**. Defendant's portfolio includes Sony Smart TVs configured with Samba TV's Google TV operating system (commonly marketed as "Sony Smart TVs"). Samba TV, Inc. (a Delaware corporation headquartered in San Jose, California) operates its own ACR pipeline on Sony Smart TVs in real time, and uses the resulting data to power its OneView ad-buying platform (which integrates the dataxu identity-and-attribution capabilities Samba TV acquired in November 2019); to operate Samba TV's proprietary identity and device graph (which Samba TV publicly states covers approximately four out of five U.S. households); and to enable cross-device addressable advertising, audience targeting, measurement, and attribution. Samba TV has publicly described its ACR-driven dataset as providing "real time, accurate aggregate insights into what viewers are watching" and as covering "one half of all smart TVs ad impressions."

155. Samba TV's receipt and use of ACR data from Sony Smart TVs makes Samba TV a separate, third-party recipient of consumers' viewing communications,

---

Second-Party_A_First_Look_at_Automatic_Content_Recognition_Tracking_in_Smart_TVs.

distinct from Sony Electronics Inc.. Defendant's manufacture, sale, configuration, software updates, and ongoing operational support of Sony Smart TVs—which it knows are designed to enable Samba TV's real-time interception, capture, and use of consumers' viewing communications—constitute aiding, agreeing with, employing, and conspiring with Samba TV to do so within the meaning of CIPA § 631(a) and the federal Wiretap Act.

156. **Google**. Sony Electronics Inc. has, since at least 2017, configured certain Sony Smart TVs to ship with the Google TV operating system, which integrates Google's ad-tech and identity-graph systems by default. Google operates one of the largest ad-tech and identity-resolution systems in the world, including Google Ads, Google Marketing Platform, and Display & Video 360. As configured by Sony, Sony Smart TVs transmit to Google, in real time and on a continuous basis, the device's Google Advertising Identifier, signed-in Google account activity, application telemetry (including which applications are launched, the duration of in-app sessions, the search and recommendation queries entered into the Google TV launcher, and on-device interaction events), and household and device identifiers, which Google associates with its account- and device-level identity graph and uses to target individual users and households across devices and contexts. Google is a separate corporate person whose contemporaneous receipt and processing of consumers' viewing-related communications and identifying data Sony aids, agrees with, employs, and conspires with within the meaning of CIPA § 631(a) and the federal Wiretap Act.

157. **Other ad-tech, data-broker, identity-resolution, and measurement partners**. On information and belief, Defendant's ACR data is further disclosed, sold, licensed, or otherwise made available to additional downstream identity-resolution providers (such as LiveRamp Holdings, Inc.), measurement and attribution providers (such as The Nielsen Company), demand-side and supply-side platforms

(such as The Trade Desk, Inc.), real-time bidding exchanges, and other ad-tech ecosystem participants. Plaintiffs reserve the right to identify additional third-party recipients in discovery.

## XIII. SONY'S MARKETING AND REPRESENTATIONS REGARDING SMART TV FUNCTIONALITY AND PRIVACY

158. Sony markets its Smart TVs as premium entertainment devices designed to provide consumers with seamless access to content and a personalized viewing experience.

159. In its marketing materials and user-facing disclosures, Sony represents that features such as "Smart TV Experience" or "personalized recommendations" enhance the user experience by tailoring content suggestions to the viewer.

160. Sony promotes these features as tools that help users discover content, enhance viewing, and personalize their entertainment experience.

161. These representations convey to reasonable consumers that any data collection associated with such features is limited, user-beneficial, and tied to improving on-screen recommendations.

162. Sony does not disclose in its marketing materials that these features function by continuously capturing and analyzing the audio and video displayed on the television screen, including content viewed through third-party applications and external devices.

163. Nor does Sony disclose that this viewing data is transmitted to third parties, including advertising and data analytics companies, for purposes unrelated to providing core television functionality.

164. Sony further fails to disclose that the data collected through ACR is used to construct cross-device identity profiles and to facilitate targeted advertising across multiple devices and platforms.

165. To the extent Sony provides disclosures regarding data collection, such disclosures are incomplete, obscured, and presented, if at all, during initial device setup—often to a different individual than the end users of the television.

166. Defendant's marketing and disclosures omit material facts necessary to prevent its representations regarding personalization and user control from being misleading.

167. Reasonable consumers, including Plaintiffs, would not expect that simply watching television in their homes would result in the continuous interception, analysis, and disclosure of their viewing activity and associated identifiers to third parties.

168. Had Plaintiffs known the true nature and scope of Defendant's data collection and sharing practices, they would not have purchased their Sony Smart TVs or would have paid substantially less for them.

169. The circumstances of Defendant's misrepresentations and omissions are as follows:

a) Defendant—which controls and disseminates the United States–facing marketing, packaging, and on-device setup screens—represented at the point of sale, and again during the initial device setup for the model years at issue, that its Smart TVs and their associated features enhance the viewing experience, describing those features with the benign labels identified above.

b) Defendant conveyed those representations on the product packaging and marketing and through the on-device setup screens presented to Plaintiffs on their Sony Smart TVs, and continued to convey them throughout each Plaintiff's ownership and use.

c) The representations were misleading because Defendant simultaneously concealed the material fact that these features operate as continuous

ACR surveillance that captures, fingerprints, and discloses to third parties the audiovisual content displayed on the screen, together with persistent identifiers tied to the household and device.

d) Nowhere did Defendant identify or explain the ACR functionality, disclose that every image and sound displayed on the screen would be intercepted and disclosed to third parties for commercial exploitation, or afford consumers a meaningful opportunity to decline.

e) As a result, a reasonable consumer—including each Plaintiff—would not have understood that purchasing and using the Sony Smart TV subjected his or her viewing activity to continuous interception and disclosure.

## XIV. SONY PURPORTS TO OBTAIN—BUT DOES NOT ACTUALLY OBTAIN—CONSUMER CONSENT THROUGH DECEPTIVE DESIGN.

170. Sony does not meaningfully disclose its ACR surveillance practices to consumers.

171. Instead, Sony presents the ACR feature during the television setup process using misleading terminology and opaque disclosures.

172. For example, Sony labels the ACR feature "Performance and Analysis Data" or "Smart TV Experience" / "Use Info from TV Inputs," terminology that does not convey that the feature enables continuous monitoring of television viewing.

173. During the setup process, consumers are required to navigate through multiple screens containing dense legal text before reaching a consent screen.

174. Most consumers click through the screenflow simply to complete the setup process and begin using the television.

175. Sony intentionally presents its privacy policies during the initial setup process when consumers are most eager to begin using their new televisions.

176. Defendant's disclosures fail to explain that enabling the feature allows Sony to continuously capture and analyze the audio and video displayed on the television screen.

177. Sony also fails to disclose that the resulting viewing data will be used to create advertising profiles or identity graphs and shared with advertising partners.

178. Even after setup, consumers who wish to disable the surveillance feature must navigate through multiple menus and obscure settings to locate the opt-out controls.

179. This design—easy opt-in combined with difficult opt-out—is a well-known manipulative interface technique commonly referred to as a "dark pattern."

180. As a result, millions of consumers have unknowingly enabled Defendant's ACR surveillance.

## XV. PLAINTIFFS AND CLASS MEMBERS HAD A REASONABLE EXPECTATION OF PRIVACY.

181. Plaintiffs and Class Members had a reasonable expectation that their television-viewing activity, and the contents of their private communications with and through their Sony Smart TVs, would remain private. Consumers do not expect to be tracked across every one of their internet-connected devices—their televisions, tablets, computers, and phones—by a company they have never heard of.

182. This expectation is reflected in the privacy-protective measures consumers have widely adopted. After Apple introduced controls allowing consumers to prevent the collection of their mobile advertising identifiers, the overwhelming majority of users invoked them—one 2021 analysis found that 88% of iOS users worldwide had done so—demonstrating consumers' intent not to be tracked.

183. Plaintiffs and Class Members did not know, and did not expect, that the technology embedded in their Sony Smart TVs was secretly intercepting their identifiable viewing activity, or that this activity would be assigned a persistent, unique identifier and incorporated into cross-device profiles used and sold for targeted advertising. They reasonably expected that they would not be surveilled in their own homes by an unknown company, let alone that their identifiable viewing history would be marketed to third parties for profit.

184. The privacy interest in one's own video-viewing history is long recognized. Congress enacted the Video Privacy Protection Act to protect it, after a newspaper published a profile of Judge Robert H. Bork derived from the films his family had rented—prompting Senator Alan Simpson to warn that "it is nobody's business" what a person watches at home and that the aggregation of such records "really is Big Brother." What a person chooses to watch in the privacy of the home reveals that person's interests, beliefs, and intimate characteristics, and is information a reasonable person expects to keep private.

185. Although the VPPA was originally intended to protect the privacy of an individual's rental videotape selections, Congress has repeatedly reiterated that the VPPA is applicable to "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.

## XVI. SONY PROFITS FROM ITS SURVEILLANCE OF CONSUMERS.

### A. Sony Derived Significant Benefits from Its Collection and Use of Plaintiffs' and Class Members' Sensitive Information.

186. The viewing data collected through Defendant's ACR system is highly valuable in the digital advertising marketplace.

187. By collecting, analyzing, and monetizing this data, Sony generates significant revenue through advertising, audience segmentation, and analytics services.

188. The data collected through Defendant's ACR Tools is used to build household-level and cross-device identity profiles, which are then leveraged to enable targeted advertising across televisions, mobile devices, and computers.

189. These practices allow Sony and its partners to deliver highly targeted advertisements, measure advertising effectiveness, and sell access to valuable audience segments.

190. As a direct result of its surreptitious collection, use, and disclosure of Plaintiffs' and Class Members' Sensitive Information, Sony has generated, and continues to generate, substantial revenue attributable to its data-driven advertising and analytics operations.

191. Through these practices, Sony has been unjustly enriched at the expense of Plaintiffs and Class Members, whose private viewing information was collected and monetized without their knowledge or informed consent.

### B. Plaintiffs' and Class Members' Data Had Independent Financial Value.

192. Plaintiffs' and Class Members' Sensitive Information has independent economic value in the marketplace for consumer data.

193. Industry data confirms that consumer data has substantial and increasing per-user value, as reflected in growing revenues from targeted advertising and the existence of programs in which companies compensate consumers in exchange for access to their behavioral data, demonstrating that such information is a recognized and tradable asset.

194. There is an active, established market for precisely the type of data Defendant and Samba TV collect from Sony Smart TVs. Advertisers spent more than

$18.6 billion on Smart TV advertising in 2022 alone, and viewing data accompanied by IP addresses—like the data intercepted here—is bought and sold every day.

195. The market price for this data is substantial and specific. Advertisers and publishers can purchase United States residents' connected-television viewership data—listing the consumer's IP address, location, and the title of the video they viewed—for $14,850 per month, or $148,500 per year. The existence of this supply side and sell side confirms that Plaintiffs' and Class Members' identifiable viewing data has objective, ascertainable monetary value.

196. Companies routinely pay for access to user-level behavioral data, including browsing activity, viewing habits, and device-level identifiers, because such data enables precise targeting and profiling. For example, several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

197. If given the choice, each Plaintiff could have sold or licensed their valuable Sensitive Information to Sony or its partners for monetary compensation, but they were not given that choice. By contrast, Sony obtained Plaintiffs' and Class Members' Sensitive Information without compensation and without informed consent, while retaining the full economic benefit of that data.

198. The unauthorized interception and disclosure of Plaintiffs' and Class Members' Sensitive Information diminished the value of that information and deprived them of the ability to control, license, or otherwise monetize their own data.

199. As a result, Plaintiffs and Class Members have suffered economic harm.

/

/

/

## XVII. SONY'S USE OF THE ACR TOOLS VIOLATES NUMEROUS STATE AND FEDERAL DATA PRIVACY LAWS.

### A. The Video Privacy Protection Act (VPPA)

200. The VPPA was enacted in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

201. Congress was particularly concerned with the privacy of individuals' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

202. Although originally enacted in the context of videotape rentals, Congress has made clear that the VPPA applies to modern technologies, including "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[5]

---

[5] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video

203. The VPPA prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without the consumer's "informed, written consent… in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b).

204. The statute defines a "video tape service provider" as any person "engaged in the business… of rental, sale, or delivery of… similar audio visual materials." 18 U.S.C. § 2710(a)(4).

205. It further defines "personally identifiable information" ("PII") as information that identifies a person as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(a)(3).

206. Sony is a "video tape service provider" within the meaning of the VPPA because it is engaged in the business of delivering video content to consumers, including through its Smart TV platform, which provides access to on-demand streaming services and Defendant's own curated video-content offerings.

207. As alleged herein, Sony, through its ACR Tools, knowingly intercepts and discloses consumers' video-viewing activity—including the specific programs and content viewed—along with persistent identifiers such as IP addresses, device identifiers, and other data that enable those viewing selections to be associated with a particular individual or household.

208. These disclosures constitute the disclosure of "personally identifiable information" under the VPPA because they identify consumers as having requested or obtained specific video materials or services.

209. Sony makes these disclosures to third parties, including advertising

---

streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of Americans' information.").

and analytics partners, for commercial purposes, including targeted advertising, audience segmentation, and measurement.

210. Sony does so without obtaining consumers' informed, written consent in a form that is distinct and separate from other terms, and, in many cases, without providing any disclosure to the actual users of the television whose viewing activity is collected and disclosed.

211. Courts have recognized that the VPPA applies to modern streaming technologies and evolving forms of audiovisual content delivery. *See, e.g., Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**B. The Federal Trade Commission Act ("FTC Act")**

212. The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Federal Trade Commission ("FTC") is charged with enforcing that prohibition, and its standards define the contours of unfair and deceptive conduct in the marketplace, including in the collection, use, and disclosure of consumers' personal information.

213. An act or practice is deceptive under the FTC Act where it involves a representation, omission, or practice that is material and likely to mislead a consumer acting reasonably under the circumstances. A failure to disclose material information—including the existence, scope, and operation of data-collection practices that a reasonable consumer would not expect—is actionable as a deceptive omission.

214. An act or practice is unfair under the FTC Act where it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). The surreptitious collection and disclosure of consumers' private television-viewing activity inflicts precisely such substantial injury, which consumers cannot reasonably avoid because the conduct is concealed and enabled by default, and which is not outweighed by any countervailing benefit.

215. The FTC has applied these standards directly to Smart TV ACR data collection. In its 2017 enforcement action against Vizio, the FTC alleged that the undisclosed, default collection of consumers' second-by-second television-viewing data, and its association with persistent identifiers and demographic information for sale to third parties, constituted both an unfair and a deceptive practice under Section 5. That action confirms that the conduct Sony engages in here—the undisclosed, ongoing capture and disclosure of viewing activity tied to persistent identifiers—falls squarely within the unfair and deceptive practices the FTC Act prohibits.

216. Sony represents its Smart TVs and their associated features—including the "Smart TV Experience," content personalization, and program-recommendation functionality—as benefits designed to enhance the viewer's experience. Sony markets these televisions as ordinary consumer-electronics products and does not represent them as instruments of continuous surveillance.

217. These representations are materially misleading because Sony fails to disclose that the same features operate by continuously capturing, fingerprinting, and analyzing the audio and video displayed on the screen—including content viewed through third-party applications, broadcast signals, and external devices connected via HDMI—on a second-by-second basis and without regard to the source of the content.

218. Sony further fails to disclose that the resulting viewing data is transmitted, in real time and near-real time, to third parties—including Samba TV and Google—and is used to construct cross-device and household identity profiles

for targeted advertising and other commercial purposes. A reasonable consumer purchasing and setting up a television would neither expect, nor be informed, that ordinary use of the device subjects every program watched to interception and disclosure.

219. The omitted information is material: a reasonable consumer's decision to purchase a Sony Smart TV, to use its features, or to take steps to limit data collection would be affected by disclosure that the device continuously records and discloses what is watched on it. Sony's failure to disclose these practices, while continuing to collect, transmit, and monetize consumers' viewing activity without informed consent, constitutes an unfair and deceptive act or practice.

## XVIII. CLASS ALLEGATIONS

220. This action is brought by the named Plaintiffs both individually, and on behalf of the following Classes and Subclasses under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4):

**Nationwide ACR Class**: All natural persons in the United States who, during the Class Period, used a Sony Smart TV on which ACR technology was enabled and that captured, analyzed, or transmitted information regarding audiovisual content displayed on the device.

**California ACR Subclass**: All members of the Nationwide ACR Class who reside in California.

**Washington ACR Subclass**: All members of the Nationwide ACR Class who reside in Washington.

**Pennsylvania ACR Subclass**: All members of the Nationwide ACR Class who reside in Pennsylvania.

**Illinois ACR Subclass**: All members of the Nationwide ACR Class who reside in Illinois.

**<u>Nationwide Samba TV Identity Graph Class</u>**: All natural persons in the United States whose viewing activity on a Sony Smart TV was used by Defendant and/or Samba TV, Inc., directly or through their respective partners, to associate that television with one or more other devices, identifiers, or datasets as part of the cross-device or household-level identification, matching, audience-segmentation, identity-graph, and OneView/dataxu identity-resolution systems operated by Samba TV using ACR data and associated identifiers obtained from Sony Smart TVs.

**<u>California Samba TV Identity Graph Subclass</u>**: All members of the Nationwide Samba TV Identity Graph Class who reside in California.

**<u>Washington Samba TV Identity Graph Subclass</u>**: All members of the Nationwide Samba TV Identity Graph Class who reside in Washington.

**<u>Pennsylvania Samba TV Identity Graph Subclass</u>**: All members of the Nationwide Samba TV Identity Graph Class who reside in Pennsylvania.

**<u>Illinois Samba TV Identity Graph Subclass</u>**: All members of the Nationwide Samba TV Identity Graph Class who reside in Illinois.

**<u>Nationwide Google Identity Graph Class</u>**: All natural persons in the United States whose viewing activity on a Sony Smart TV was used by Defendant and/or Google LLC, directly or through their respective partners, to associate that television with one or more other devices, identifiers, or datasets as part of the cross-device or household-level identification, matching, audience-segmentation, identity-graph, and Google Ads / Google Marketing Platform / Display & Video 360 advertising-resolution systems operated by Google using the device's Google Advertising Identifier, signed-in Google account activity, application telemetry, household and device identifiers, and (where applicable) ACR-derived data obtained from Sony Smart TVs configured with the Google TV or Android TV operating system.

**<u>California Google Identity Graph Subclass</u>**: All members of the Nationwide Google Identity Graph Class who reside in California.

**<u>Washington Google Identity Graph Subclass</u>**: All members of the Nationwide Google Identity Graph Class who reside in Washington.

**<u>Pennsylvania Google Identity Graph Subclass</u>**: All members of the Nationwide Google Identity Graph Class who reside in Pennsylvania.

**<u>Illinois Google Identity Graph Subclass</u>**: All members of the Nationwide Google Identity Graph Class who reside in Illinois.

221. The Nationwide ACR Class and the two Nationwide Identity Graph Classes (the Nationwide Samba TV and Google Identity Graph Classes) are collectively referred to as the "Nationwide Classes." The California ACR Subclass and the two California Identity Graph Subclasses (the California Samba TV and Google Identity Graph Subclasses) are collectively referred to as the "California Subclasses." The Nationwide Classes, the California Subclasses, and the State Subclasses defined above are collectively referred to herein as the "Class."

222. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which any Defendant has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

223. Plaintiffs reserve the right to amend the definitions of the Class or add or refine Subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified, including based on the identification of additional ACR providers, identity-graph operators, or other downstream recipients of Sony ACR data in discovery.

224. **<u>Numerosity.</u>** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 100,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is

generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

225. **Commonality.** Common questions of law and fact arise from Defendant's uniform conduct and are capable of classwide resolution. These common questions predominate over any questions affecting only individual Class Members and include, without limitation:

a) Whether Defendant's ACR-enabled collection, interception, and disclosure of Sensitive Information occurred in a substantially similar manner for all Class Members;

b) Whether Defendant collected, transmitted, and disclosed Class Members' Sensitive Information—including video-viewing activity and associated identifiers—to third parties without adequate notice or consent;

c) Whether Defendant's disclosures, if any, regarding its data collection and sharing practices were misleading, incomplete, or insufficient to obtain informed consent;

d) Whether Defendant and its partners used persistent identifiers to link Class Members' viewing activity across devices and to create cross-device identity profiles;

e) Whether Defendant had a duty to refrain from collecting, intercepting, or disclosing Class Members' Sensitive Information without authorization;

f) Whether Defendant's conduct constitutes an unlawful interception, disclosure, or use of Sensitive Information under the statutes asserted herein, including but not limited to the Video Privacy Protection Act;

g) Whether the information disclosed by Defendant constitutes "personally identifiable information" or otherwise protected information under applicable law;

h) Whether Defendant's conduct was unfair, unlawful, or deceptive;

i) Whether Defendant was unjustly enriched by its collection and monetization of Class Members' Sensitive Information;

j) Whether Class Members suffered injury, including invasion of privacy and loss of control over their Sensitive Information, as a result of Defendant's conduct;

k) Whether Defendant's conduct entitles Plaintiffs and Class Members to statutory, actual, nominal, and/or punitive damages; and

l) Whether injunctive or declaratory relief is warranted to prevent Defendant's ongoing collection, use, and disclosure of Class Members' Sensitive Information.

226. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the ACR Tools.

227. **Adequacy**. Plaintiffs will fairly and adequately represent and protect interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

228. **Predominance**. Defendant has engaged in a common course of conduct

toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, like Google, in the same way. The common issues arising from Defendant's

conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

229. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

230. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

231. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

c) Whether Defendant failed to comply with applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Sensitive Information would be collected disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information collected and disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

232. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## XIX. TOLLING AND ESTOPPEL

233. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation and operation of ACR technology and related data-collection and transmission systems on Sony Smart TVs.

234. The ACR systems on Sony Smart TVs are, and at all relevant times have been, invisible to the average user and operate without any contemporaneous indication that audio or video content is being captured, analyzed, or transmitted, including because Defendant's conduct occurs at the device and server level and is not observable through ordinary use of the television. There is no on-screen indicator, recording light, transmission alert, or other visual cue that would alert a reasonable consumer that the Smart TV is, in real time, capturing fingerprints of every sound and image displayed on the screen and transmitting that data to remote servers

operated by Samba TV and Google, Samba TV, Defendant's affiliates, or any other downstream recipient.

235. Defendant had exclusive knowledge that Sony Smart TVs incorporated ACR technology and were configured to capture, process, and transmit content-derived data and associated identifiers to multiple separate third parties, including Samba TV and Google, yet failed to adequately disclose any of these practices to users, including Plaintiffs and Class Members.

236. Defendant further concealed the nature, scope, and consequences of these practices through misleading terminology, fragmented disclosures, and deceptive interface design, including (a) the use of the benign-sounding label "Smart TV Experience" or "Performance and Analysis Data" or "Use Info from TV Inputs" (which does not, by its terms, identify any third party, identify ACR functionality, or convey that the feature operates as continuous frame-by-frame surveillance); (b) the bundling of multiple agreements during setup such that meaningful review of the ACR-related disclosure was practically impossible; and (c) the dispersion of opt-out controls across four or more separate menus requiring more than 200 clicks, which obscured the practices in operation at the time of each Plaintiff's purchase.

237. Under these circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection, use, and disclosure of users' Sensitive Information. To date, Defendant has not fully disclosed or acknowledged the extent to which it captured, identified, and transmitted users' viewing activity and associated identifiers to third parties such as Samba TV and Google, Samba TV, and Defendant's affiliates.

238. Accordingly, Defendant is estopped from relying on any statute of limitations.

239. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

240. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct (as alleged with specificity in this Complaint) was shortly before this action was filed, when independent forensic and academic analysis of Smart TV ACR network traffic, together with counsel's pre-suit investigation, first identified the specific ACR practices, third-party-disclosure pipelines, and deceptive labeling and dark-pattern consent architecture alleged herein. Prior to that time, no public source identified, by name and with the specificity necessary to put a reasonable consumer on notice, Defendant's specific ACR practices, Defendant's specific third-party-disclosure pipelines, or Defendant's specific deceptive labeling and dark-pattern consent architecture.

241. Although prior reports suggested that certain smart televisions collected viewing data, those generic reports did not reveal the nature, scope, or recipients of Defendant's specific ACR-based interceptions. Defendant did not disclose that Sony Smart TVs captured content displayed across all inputs—including HDMI-connected devices—or that such information was transmitted in real time and near-real time to multiple separate third parties such as Samba TV and Google. These transmissions occurred through hidden background processes not visible to users and were only recently uncovered through forensic network analysis by independent academic researchers and counsel's pre-suit investigation. As a result, Plaintiffs and Class Members could not reasonably have discovered Defendant's unlawful conduct earlier through the exercise of reasonable diligence.

242. Defendant may contend that Plaintiffs were on inquiry notice based on (i) Defendant's own privacy policy or EULA; (ii) the 2024 Anselmi academic study; (iii) earlier consumer-press coverage of Smart TV data collection generally; (iv) a 2016 FTC workshop discussing ACR; or (v) the Federal Trade Commission and New Jersey Attorney General's 2017 settlement with Vizio for similar Smart TV ACR conduct. None of those sources put a reasonable Sony Smart TV owner on inquiry

notice of the specific conduct alleged here. Defendant's own disclosures used misleading terminology that does not identify any third-party recipient or convey continuous ACR surveillance, and were buried behind dark-pattern consent flows. The 2024 Anselmi paper was published in a technical academic repository requiring network-analysis expertise to interpret and was not disseminated to consumers. The earlier consumer-press coverage and the 2016 FTC workshop addressed Smart TV manufacturers and ACR generally, did not name Sony, and did not identify Defendant's specific ACR vendors (Samba TV and Google) or third-party data recipients. The 2017 FTC—Vizio settlement involved a different manufacturer and did not identify Sony or Defendant's ACR vendors. None of these sources was a "storm warning" of consumer-side liability sufficient to commence the limitations period as a matter of California or federal law.

243. Beyond the discovery rule and equitable estoppel, Defendant's continuing course of conduct independently tolls the applicable limitations periods. Defendant's ACR system continues to capture, transmit, and re-distribute Plaintiffs' and Class Members' communications and personal identifiers in real time and near-real time, on every Sony Smart TV in operation, to the present day. Each new audiovisual fingerprint captured, each new transmission of that fingerprint and associated persistent identifiers to Defendant, Samba TV, Google, or any other downstream recipient, and each new re-disclosure or re-use of that data by Defendant or its downstream partners, is an independent and separately actionable violation that triggers a fresh limitations period, including under the federal Wiretap Act (each interception), CIPA §§ 631, 632, and 638.50–638.51 (each unauthorized interception or recording), the VPPA (each disclosure of personally identifiable viewing information), and the UCL (each unfair, unlawful, or fraudulent business act).

/

/

## XX. CLAIMS FOR RELIEF

## COUNT I

### Invasion of Privacy – Intrusion Upon Seclusion

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

244. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

245. Plaintiffs bring this claim under California common law.

246. At all relevant times, Plaintiffs and members of the Class had a reasonable expectation of privacy in their homes and in the audiovisual content they viewed on their televisions.

247. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

248. Defendant, through its Smart TVs and embedded ACR technology, intentionally intruded upon Plaintiffs' and Class Members' private affairs.

249. Specifically, Defendant's Smart TVs continuously monitored what appeared on the television screen by capturing audio and visual information from content displayed on the device.

250. Defendant's ACR system captured information reflecting Plaintiffs' viewing behavior, including the programs watched, the applications used, and the content displayed through external devices connected via HDMI.

251. By capturing and analyzing this information, Sony intruded into Plaintiffs' private viewing activity within the home.

252. Defendant's conduct enabled it to construct detailed profiles of Plaintiffs' interests, habits, and personal characteristics based on viewing behavior.

253. These profiles included Sensitive Information reflecting Plaintiffs' preferences, beliefs, and lifestyle.

254. Sony designed, implemented, and deployed ACR technology for the purpose of collecting and monetizing consumer viewing data.

255. Defendant's third-party ad-tech partners (Samba TV and Google) used this data to identify the specific audiovisual content being viewed—including programs, episodes, advertisements, and other on-screen material—regardless of whether that content originated from streaming applications, broadcast signals, or HDMI-connected external devices. This content recognition occurred within seconds of display and operated continuously or at frequent intervals during device use, enabling those partners to track Plaintiffs' and Class Members' viewing activity as it occurred.

256. In connection with this conduct, those third-party recipients received and processed persistent identifiers associated with Plaintiffs' and Class Members' devices and households, including IP addresses, MAC addresses, advertising identifiers, household identifiers, and other unique or quasi-unique signals, and used these identifiers, together with additional data obtained from third-party partners (including identity-resolution providers and data brokers), to associate Plaintiffs' and Class Members' Smart TV activity with other devices and identities.

257. Through these practices, Defendant's third-party ad-tech partners constructed and maintained identity-resolution systems—commonly referred to as identity graphs—that linked Plaintiffs' and Class Members' televisions, mobile devices, computers, and other connected devices to a unified profile representing the household and its inferred members. Those identity graphs and related systems enabled the partners to combine ACR-derived viewing data with other datasets, including advertising identifiers and partner-provided information, to generate

detailed, cross-device profiles reflecting Plaintiffs' viewing habits, preferences, and personal characteristics.

258. Through this aggregation and profiling, those third-party recipients were able to infer sensitive attributes about Plaintiffs and Class Members—including their political preferences, religious beliefs, health conditions, sexual orientation, family composition, financial status, and personal interests—and to associate those attributes with identifiable households and devices, and to use these profiles to create audience segments, enable targeted advertising, and facilitate cross-device tracking, and to disclose or make the resulting information available to other ad-tech partners, advertisers, data brokers, and identity-resolution providers for commercial purposes.

259. This conduct—intercepting and analyzing Plaintiffs' private viewing activity in real time or near-real time, linking that activity to persistent identifiers, constructing cross-device identity profiles, and disseminating those profiles within the connected-television advertising ecosystem—constitutes a separate and independently actionable intrusion into Plaintiffs' and Class Members' private affairs.

260. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in § XIV, *supra*.

261. Defendant's intrusion into Plaintiffs' private affairs would be highly offensive to a reasonable person.

262. A reasonable consumer would not expect that a television would continuously monitor and record the content displayed on its screen for the purpose of data collection and advertising.

263. Defendant's conduct therefore constitutes an intentional intrusion upon the solitude and seclusion of Plaintiffs and members of the Class.

264. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

265. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

## COUNT II

### Invasion of Privacy – Public Disclosure of Private Facts

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

266. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

267. Plaintiffs bring this claim under California common law.

268. At all relevant times, Plaintiffs and members of the Class had a reasonable expectation that their television viewing activity and related information would remain private.

269. Defendant, through its Smart TVs and embedded ACR technology, collected and disclosed private, Sensitive Information concerning Plaintiffs' viewing behavior.

270. Specifically, Sony collected detailed information about the audiovisual content displayed on Plaintiffs' television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

271. This information also included content viewed through third-party applications, broadcast signals, and external devices connected via HDMI.

272. The viewing information collected by Sony constituted private facts because it reflected Plaintiffs' personal interests, habits, and preferences.

273. More specifically, the private facts Defendant disclosed are not merely that Plaintiffs watched unspecified content; rather, they include (i) specific program titles, episodes, advertisements, and external-input content viewed by each Plaintiff; (ii) timestamped logs of each viewing session, by household and device; and (iii) inferred sensitive attributes about each Plaintiff that Defendant's ad-tech partners, including Samba TV and Google, expressly compute from the disclosed viewing data, including political beliefs and affiliations (e.g., audience segments built from State of the Union viewing or "liberal affinity news" or "conservative affinity news" viewing), religious beliefs and observances, sexual orientation (e.g., audience segments built from Pride Month programming), racial and ethnic identification, family composition (including the presence and ages of children), health conditions and medical concerns, financial circumstances, and other intimate personal characteristics. These categories of inferred personal attributes are precisely the "embarrassing" or "intimate" private facts that California courts and the Ninth Circuit have recognized as actionable. See *Harris v. iHeartMedia, Inc.*, 2026 WL 247875, at *1–2 (N.D. Cal. Jan. 29, 2026); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1088 (N.D. Cal. 2025); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 604 (9th Cir. 2020).

274. Defendant's disclosure of these private facts is "public" within the meaning of California law because it is not limited to a single recipient or a confidential audience. Defendant's disclosure pipeline routes the data to multiple separate corporate recipients—including Samba TV and Google—and, through Samba TV's and Google's downstream commercial pipelines, into the broader connected-television advertising ecosystem comprising numerous demand-side and supply-side platforms, identity-resolution providers, data brokers, advertisers, agencies, and measurement and attribution providers. Defendant's conduct therefore

disseminates Plaintiffs' private facts well beyond a confidential or limited audience, satisfying the "public disclosure" element under California law.

275. Such viewing activity is inherently private and is not ordinarily exposed to the public.

276. Sony disclosed this private, Sensitive Information to third parties, including advertisers, analytics providers, and other commercial entities.

277. Defendant's third-party ad-tech partners (Samba TV and Google) received Plaintiffs' and Class Members' viewing data and associated identifiers in real time or near-real time and used that information to identify the specific audiovisual content viewed by Plaintiffs and Class Members, including programs, advertisements, and other on-screen material. In connection with this conduct, those partners associated Plaintiffs' viewing activity with persistent identifiers, including IP addresses, MAC addresses, advertising identifiers, household identifiers, and other signals, and combined that information with data obtained from third-party partners and data providers.

278. Through these processes, those third-party recipients constructed and maintained cross-device and household-level identity profiles that linked Plaintiffs' Sony Smart TV viewing activity to other devices, identities, and datasets, and used these profiles to generate audience segments and other commercially valuable datasets reflecting Plaintiffs' viewing habits, interests, and inferred characteristics.

279. Those third-party recipients further disclosed, sold, licensed, or otherwise made available Plaintiffs' viewing information and derived profiles to additional third parties within the advertising and data ecosystem, including by re-distributing audience segments and targeting data to advertisers, agencies, and demand-side platforms. By transforming Plaintiffs' private viewing activity into identifiable, cross-device profiles and distributing that information to numerous third

parties, Defendant caused Plaintiffs' private facts to be publicly disclosed within the meaning of California law.

280. Upon information and belief, Sony shared or made available Plaintiffs' viewing data to these third parties in a manner that enabled them to use the data for targeted advertising, analytics, and profiling purposes.

281. Defendant's disclosures were not limited to a small or confidential group but instead were made to multiple third-party entities within the advertising and data ecosystem.

282. Through these disclosures, Plaintiffs' private viewing information was disseminated beyond Sony and into a broader commercial network.

283. Defendant's disclosures were made without Plaintiffs' consent.

284. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

285. Sony also failed to adequately disclose the scope and nature of the information being disclosed.

286. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

287. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

288. The private facts disclosed by Sony would be highly offensive and objectionable to a reasonable person.

289. A reasonable consumer would not expect that a television manufacturer would collect and disclose detailed information about their viewing habits to third parties.

290. The disclosure of such information exposes intimate details about an individual's interests, beliefs, and lifestyle.

291. Defendant's conduct therefore constitutes a public disclosure of private facts.

292. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

293. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

**COUNT III**

**Invasion of Privacy – Violation of the California Constitution (Art. I, § 1)**

(Against Defendant Sony Electronics Inc. on Behalf of California Plaintiffs and the California Subclasses; and, as to the public injunction, on behalf of the California general public)

294. California Plaintiffs (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

295. Plaintiffs bring this claim under Article I, Section 1 of the California Constitution, which guarantees a right to privacy.

296. The California Constitution protects individuals against the invasion of their privacy by private entities, including the unauthorized collection, use, and disclosure of personal information.

297. To establish a violation of the constitutional right to privacy, a plaintiff must show: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) a serious invasion of privacy.

298. Plaintiffs and members of the Class possessed legally protected privacy interests in their personal information, including their television viewing activity and related audiovisual data.

299. Plaintiffs' viewing behavior, including the content watched, the timing and duration of viewing sessions, and the sources of such content, constituted personal Sensitive Information.

300. This information revealed details about Plaintiffs' interests, habits, preferences, and personal characteristics.

301. Plaintiffs and members of the Class had a reasonable expectation that their television viewing activity within their homes would remain private.

302. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

303. Defendant violated Plaintiffs' reasonable expectation of privacy by collecting, analyzing, and disclosing Plaintiffs' viewing data through its Smart TVs and embedded ACR technology.

304. This capture occurred continuously during use of the television and operated independently of the source of the content.

305. Defendant's surveillance extended to content viewed through streaming applications, broadcast television, and external devices connected via HDMI.

306. Sony thereby monitored Plaintiffs' viewing activity across all inputs and sources.

307. Sony used the information obtained through this surveillance to build detailed profiles of Plaintiffs' viewing habits and preferences.

308. Sony further disclosed or made this information available to third parties, including advertisers and analytics providers, for commercial purposes.

309. Defendant's conduct constituted a serious invasion of Plaintiffs' privacy.

310. The scope, duration, and nature of Defendant's surveillance—continuous monitoring of audiovisual content within the home—were highly intrusive.

311. Defendant's conduct enabled the collection of detailed and Sensitive Information about Plaintiffs' private life.

312. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

313. Sony also failed to disclose the full scope and purpose of its data collection and sharing practices.

314. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

315. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

316. Moreover, Defendant's surveillance affected individuals who never interacted with Defendant's disclosures or consent mechanisms, including other household members and guests.

317. Defendant's conduct therefore violated Plaintiffs' right to privacy under the California Constitution.

318. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

319. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including injunctive relief and any other relief deemed appropriate by the Court.

320. Plaintiffs, on behalf of the general public, seek public injunctive relief under the California Constitution enjoining Sony from deploying, operating, or enabling Automatic Content Recognition technology that intercepts, records, or discloses the viewing activity or other personal information of California consumers without first obtaining clear, conspicuous, and separately disclosed consent. The primary purpose and effect of this relief is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Sony Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. Because Sony continues to manufacture, sell, and operate Smart TVs that perform this surveillance, its unlawful conduct is ongoing and, absent an injunction, will continue to harm the public at large. This relief is prospective, runs to the general public, and does not require the Court to consider the individual claims of any non-party. Plaintiffs and the general public have no adequate remedy at law to secure Defendant's future compliance with California law.

**COUNT IV**

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 631**

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Class, and in the alternative, the California Plaintiffs and the California Subclasses)

321. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

322. CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learn[s] the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

323. Defendant is a person under CIPA § 631.

324. At all relevant times, Plaintiffs and members of the Class used Sony Smart TVs to access and display audiovisual content transmitted over the internet and other communication networks while in California.

325. Defendant—directed from and within California—through its Smart TVs and embedded ACR technology, enabled, facilitated, and caused third parties—including Samba TV, Inc. and Google LLC—to intercept Plaintiffs' communications while they were in transit.

326. Specifically, Sony integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or visual information from content displayed on the television screen in near real time.

327. These third-party technologies intercepted communications transmitted to and from Plaintiffs' device, including content delivered through streaming services, broadcast signals, and external devices connected via HDMI.

328. This interception occurred contemporaneously with the transmission and display of audiovisual content, while such communications were in transit, and before they reached a completed and static form.

329. More specifically, Defendant's ACR architecture is designed to read and learn the contents of consumers' audiovisual communications while those communications are still in transit, before they are received in a completed and static form. Defendant's ACR software (developed and operated through Defendant's relationships with Samba TV, Inc. and Google LLC) generates content-identifying digital "fingerprints" on the Sony Smart TV itself by sampling each frame of audio and video as the frame is rendered to the consumer's screen—as documented by independent academic forensics, in increments measured in milliseconds (e.g., every 10 milliseconds, batched and transmitted to ACR-vendor servers every approximately 15 seconds). The fingerprint generation is itself a real-time learning of the substance, purport, and meaning of the audiovisual communication: the device-side ACR module identifies the on-screen content (program, episode, advertisement, application, or HDMI source) at the moment of display and prior to any persistent storage of the fingerprint by the ACR vendor.

330. Once transmitted, the fingerprints are matched in real time or near-real time against Defendant- or Samba TV-controlled databases of known content. That matching process is itself a contemporaneous learning of the contents of Plaintiffs' communications: the ACR vendor identifies the specific program, episode, advertisement, or external-input content displayed on the Sony Smart TV before the data is stored, before the consumer's viewing session is complete, and before the audiovisual communication has reached a completed and static form on the consumer's screen. Plaintiffs further allege, on information and belief, that Samba TV incorporates the identified content into household-level audience segments, identity-graph nodes, and real-time bidding inventories before the consumer finishes

watching the content—and that Google likewise incorporates the identifier-, account-, and application-telemetry data it receives from Sony Smart TVs into household-level audience segments, identity-graph nodes, and real-time bidding inventories on the same contemporaneous basis.

331. Accordingly, Defendant's and the third-party ACR vendors' interception of Plaintiffs' communications is not a mere post-hoc processing of stored data. It is a real-time, frame-by-frame reading and learning of the contents of consumers' audiovisual communications while those communications are in transit and before they reach a completed and static form, in violation of Cal. Penal Code § 631(a).

332. By capturing the audiovisual content displayed on Plaintiffs' screens and processing it through digital fingerprinting and content-matching to identify and learn the specific content viewed and its meaning, Defendant read, acquired, and learned the contents of Plaintiffs' electronic communications.

333. Sony knowingly aided, agreed with, employed, and conspired with each of multiple separate third parties—including Samba TV, Inc. (with respect to Sony Smart TVs configured with the Google TV operating system); Google LLC (with respect to Sony Smart TVs configured with the Google TV operating system); Samba TV, LLC; and additional downstream demand-side platforms, supply-side platforms, identity-resolution providers, and measurement and attribution providers—to intercept, read, and learn the contents and meaning of Plaintiffs' and Class Members' electronic communications in real time or near-real time, while those communications were in transit and before they reached a completed and static form, in violation of Cal. Penal Code § 631(a).

334. Each such third party is a separate "person" within the meaning of Cal. Penal Code § 631(a) and the cases construing it. Defendant's status as a party to certain of those communications therefore does not shield it from liability, because

Defendant's conduct falls within the "aids, agrees with, employs, or conspires with any person or persons" clause of § 631(a).

335. Defendant's aiding was undertaken knowingly and intentionally, with full awareness that Samba TV and Google, Samba TV, and the other downstream third-party recipients would, in real time or near-real time, capture, decode, fingerprint, and learn the contents and meaning of consumers' private viewing communications. Sony engineered and configured its Smart TVs, software, and over-the-air updates with the specific purpose of enabling these third-party interceptions; entered into commercial agreements the express purpose of which is to enable third-party access to consumers' intercepted ACR communications; and continues to update and operationally support the systems through which the third-party interceptions occur.

336. Sony provided the hardware, software environment, and system-level access necessary for these third parties to perform the interception.

337. Sony also configured its Smart TVs to permit and facilitate the operation of these third-party interception technologies across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

338. As a result, third parties intercepted communications that occurred entirely outside of Defendant's own services or platforms.

339. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

340. Because CIPA requires the consent of all parties to a communication, the real-time and near-real-time interception of communications by Defendant's third-party partners—including Samba TV, Inc., Google LLC, and additional downstream demand-side platforms, supply-side platforms, identity-resolution providers, and measurement and attribution providers—was unlawful.

341. Plaintiffs and members of the Class had a reasonable expectation that their viewing activity—including the audiovisual content displayed on their televisions—would not be intercepted or monitored by Sony.

342. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

343. As a direct and proximate result of Defendant's violations of CIPA, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

344. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

## COUNT V

## Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 632

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Class, and in the alternative, the California Plaintiffs and the California Subclasses)

345. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

346. Cal. Penal Code § 632 prohibits any person, without the consent of all parties to a confidential communication, from intentionally eavesdropping upon or

recording the confidential communication by means of any electronic amplifying or recording device.

347. At all relevant times, Plaintiffs and members of the Class engaged in communications through their use of Sony Smart TVs, including audiovisual transmissions delivered through streaming applications, broadcast signals, and external devices connected via HDMI.

348. Defendant, through its Smart TVs and embedded ACR technology, installed or used—and enabled, facilitated, and caused third parties, including Samba TV, Inc. and Google LLC, to install or use—a process that recorded and captured the routing, addressing, and signaling information associated with Plaintiffs' electronic communications, including IP addresses, device and household identifiers, and the origin, destination, timing, and fact of the transmissions of Plaintiffs' viewing data.

349. Specifically, Sony integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or audiovisual information from content displayed on the television screen in near real time.

350. Sony knowingly aided, agreed with, employed, and conspired with these third parties to install and use such pen-register and trap-and-trace processes on Plaintiffs' Sony Smart TVs, without Plaintiffs' consent and without a court order, in violation of Cal. Penal Code §§ 638.50–638.51.

351. Sony provided third parties with persistent identifiers, device-level access, and content recognition outputs sufficient to associate recorded communications with specific users and households.

352. Plaintiffs and members of the Class reasonably expected that their viewing activity and the audio and audiovisual content displayed within their homes would not be recorded or monitored by Sony.

353. The communications occurred within private residences and concerned personal viewing choices, habits, and interests, which are inherently private in nature.

354. Sony configured its Smart TVs to permit and facilitate the operation of these third-party recording technologies across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI, as well as other personal devices connected over Wi-Fi internet, such as computers, smartphones and tablets.

355. Plaintiffs and members of the Class did not consent to the recording of their confidential communications by Defendant's third-party partners.

356. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

357. Because CIPA requires the consent of all parties to a communication, the recording of communications by Defendant's third-party partners—including Samba TV and Google—was unlawful.

358. Plaintiffs and members of the Class had a reasonable expectation that their confidential communications—including audiovisual content viewed within their homes—would not be recorded by Sony.

359. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

360. As a direct and proximate result of Defendant's violations of Cal. Penal Code § 632, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

361. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

## COUNT VI

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code §§ 638.50–638.51**

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Class, and in the alternative, the California Plaintiffs and the California Subclasses)

362. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

363. Cal. Penal Code § 638.50 prohibits any person or entity from knowingly installing or using a pen register or trap and trace device without first obtaining a court order or authorization as required by law.

364. Cal. Penal Code § 638.51 prohibits any person or entity from installing or using a pen register or trap and trace device without the consent of the user of the service.

365. A "pen register" is defined under California law as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

366. A "trap and trace device" is defined as a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication.

367. At all relevant times, Plaintiffs and members of the Class used Sony Smart TVs to send and receive electronic communications over the internet and other communication networks while in California.

368. These communications included, among other things:

- requests for streaming video content;

- application usage data;
- device-level communications between Smart TVs and remote servers; and
- audiovisual transmissions delivered to the television through streaming services and external devices.

369. Defendant, through its Smart TVs and embedded ACR technology, knowingly installed and operated processes that functioned as pen registers and trap and trace devices.

370. Specifically, Defendant's ACR system and related telemetry processes captured and recorded routing, addressing, and signaling information associated with communications transmitted to and from Plaintiffs' Smart TV.

371. This information included, among other things:

- identifiers associated with content being requested or displayed;
- application identifiers and usage signals;
- device identifiers and network information; and
- other metadata reflecting how, when, and from where communications were transmitted.

372. Defendant's systems captured this information contemporaneously with the transmission of communications and without regard to the source of the content.

373. By capturing and processing this information, Sony recorded dialing, routing, addressing, and signaling information associated with Plaintiffs' electronic communications.

374. Sony also captured incoming and outgoing communication signals sufficient to identify the source and destination of communications involving Plaintiffs' Smart TV.

375. Defendant's conduct therefore constituted the use of pen registers and trap and trace devices within the meaning of Cal. Penal Code §§ 638.50–638.51.

376. Sony installed and used these devices and processes without obtaining a court order or lawful authorization.

377. Sony also installed and used these devices and processes without the consent of Plaintiffs and members of the Class.

378. Plaintiffs and members of the Class were not informed that Sony would capture routing, addressing, and signaling information associated with their communications.

379. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

380. Sony obscured the nature of its data collection through misleading terminology, including labeling its surveillance features as "Performance and Analysis Data" or "Smart TV Experience" / "Use Info from TV Inputs."

381. Specifically, Sony integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured communications and associated signaling information, and Sony aided and assisted those third parties to capture that information.

382. Moreover, Defendant's data collection captured communications and associated signaling information of individuals who never interacted with Defendant's disclosures or consent mechanisms, including other household members and guests.

383. Plaintiffs and members of the Class had a reasonable expectation that the routing, addressing, and signaling information associated with their communications would not be captured or monitored by Sony.

384. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

385. As a direct and proximate result of Defendant's violations of Cal. Penal Code §§ 638.50–638.51, Plaintiffs and members of the Class have suffered harm,

including invasion of privacy, loss of control over personal information, and statutory damages.

386. Pursuant to Cal. Penal Code § 637.2 and other applicable provisions, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

**COUNT VII**

**Violation of the Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502**

(Against Defendant Sony Electronics Inc. on Behalf of California Plaintiffs and the California Subclasses)

387. California Plaintiffs (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

388. Plaintiffs bring this claim under the CDAFA, Cal. Penal Code § 502.

389. At all relevant times, Plaintiffs' Sony Smart TVs constituted a "computer," "computer system," and/or "computer network" within the meaning of Cal. Penal Code § 502(b).

390. Plaintiffs and members of the Class were the owners and/or authorized users of their Sony Smart TVs.

391. Defendant knowingly and without permission accessed, used, and caused to be used Plaintiffs' Smart TV and related computer systems.

392. Specifically, Sony, through its embedded ACR technology and related software processes, accessed Plaintiffs' Smart TV to collect, extract, and transmit data regarding Plaintiffs' viewing activity.

393. Defendant's conduct included taking, copying, and making use of data from Plaintiffs' Smart TV, including audiovisual content information, device-level data, and associated identifiers.

394. Sony used this data for its own commercial purposes, including advertising, analytics, and consumer profiling.

395. Defendant's conduct violated Cal. Penal Code § 502(c), including but not limited to:

- § 502(c)(1), by knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using data and computer systems;
- § 502(c)(2), by knowingly accessing and without permission taking, copying, or making use of data from a computer, computer system, or computer network;
- § 502(c)(3), by knowingly and without permission using or causing to be used computer services; and
- § 502(c)(7), by knowingly accessing or causing to be accessed any computer, computer system, or computer network without permission.

396. Defendant's access to Plaintiffs' Smart TVs and associated data was without permission because Plaintiffs did not authorize Sony to collect, extract, or monetize detailed information about the audiovisual content displayed on the device.

397. Any purported authorization obtained by Sony was invalid because it was not informed, explicit, or meaningful.

398. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

399. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class suffered damage and loss within the meaning of Cal. Penal Code § 502(e), including but not limited to:

- unauthorized use of their devices and data;
- misappropriation of valuable personal information; and

- loss of control over their data.

400. Defendant's conduct was knowing, intentional, and wrongful.

401. *Pleading expressly in the alternative to Plaintiffs' invasion of privacy claims,* Plaintiffs and Class Members have suffered "damage or loss" within the meaning of Cal. Penal Code § 502(e). Plaintiffs intended to retain the option to monetize, license, or otherwise control the disposition of their viewing data and household-level identifiers, including by participating in the established market in which companies (such as Nielsen, UpVoice, HoneyGain, SavvyConnect, and others) compensate consumers in exchange for license to track specified categories of personal data. Defendant's unauthorized capture, extraction, transmission, and re-distribution of Plaintiffs' viewing data and identifiers materially diminished the value of that data to Plaintiffs by (i) extracting and segmenting the data before Plaintiffs could license it themselves, (ii) injecting the data into proprietary identity graphs and audience segments operated by Samba TV and Google (which exclude Plaintiffs from any subsequent monetization), and (iii) reducing the marginal commercial value of the data on the consumer-data market by virtue of its prior unauthorized commercial exploitation. Plaintiffs have therefore suffered both deprivation of the right to control their data and a diminution in its market value—each of which constitutes "damage or loss" under § 502(e).

402. In addition, Plaintiffs and Class Members have incurred (and on information and belief will continue to incur) reasonable expenditures—within the meaning of Cal. Penal Code § 502(e)(1)—to investigate, identify, and verify the unauthorized access to and extraction of data from their Sony Smart TVs, including time and resources expended to ascertain whether their Smart TV systems and stored configuration data have been altered, accessed, or used by Defendant and the third-party ACR vendors (Samba TV and Google) without authorization.

403. Pursuant to Cal. Penal Code § 502(e) and (e)(1), Plaintiffs and members of the Class seek compensatory damages, injunctive relief, and all other relief available under the law.

**COUNT VIII**

**Violation of the Federal Wiretap Act (as amended by the Electronic Communications Privacy Act or "ECPA"), 18 U.S.C. § 2510, *et seq*.**

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Classes)

404. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

405. Plaintiffs bring this claim under the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq*.

406. The Federal Wiretap Act prohibits any person from intentionally intercepting, or endeavoring to intercept, the contents of any electronic communication, and from intentionally using or disclosing the contents of any electronic communication knowing or having reason to know that the information was obtained through an unlawful interception.

407. At all relevant times, Plaintiffs and members of the Nationwide Class transmitted and received electronic communications through their use of Sony Smart TVs.

408. These communications included, among other things, streaming video content, audiovisual transmissions, application data, and communications between Plaintiffs' Smart TV and remote servers.

409. These transmissions constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

410. Defendant, through its Smart TVs and embedded ACR technology, itself intentionally intercepted and endeavored to intercept these communications.

411. Specifically, Defendant's ACR system captured audio and/or visual information from content displayed on Plaintiffs' television screen in near real time.

412. This capture occurred contemporaneously with the transmission and display of the communications.

413. By capturing the audiovisual content displayed on Plaintiffs' screens and processing it through digital fingerprinting and content-matching to identify and learn the specific content viewed and its meaning, Defendant read, acquired, and learned the contents of Plaintiffs' electronic communications.

414. Defendant's interception occurred while the communications were in transit, and before they reached their intended destination in a completed and static form.

415. Defendant's ACR system captured communications across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

416. As a result, Sony intercepted communications that occurred entirely outside of Defendant's own services or platforms.

417. Sony also used and disclosed the contents of these communications for its own commercial purposes, including advertising, analytics, and profiling.

418. Defendant's conduct was intentional.

419. Plaintiffs and members of the Nationwide Class did not consent to Defendant's interception, use, or disclosure of their communications.

420. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

421. Even if Defendant were deemed a party to any of the intercepted communications, the party exception set forth in 18 U.S.C. § 2511(2)(d) does not apply, because Defendant intercepted those communications for the purpose of committing the tortious acts described below.

422. Defendant intercepted Plaintiffs' communications in order to collect, analyze, profile, disclose, and monetize detailed information regarding Plaintiffs' private viewing activity, without authorization.

423. Defendant intercepted Plaintiffs' communications for the purpose of committing an independent tort: invasion of privacy by intrusion upon seclusion, *as alleged in Count I and incorporated by reference herein*. That tortious purpose is separate and independent from the act of interception itself, because the intrusion is accomplished not by the mere capture of the communications, but by Defendant's subsequent compilation of Plaintiffs' viewing activity into persistent, cross-device household profiles tied to identifying information, and by Defendant's disclosure and sale of that information to Samba TV, Google, and the broader connected-television advertising ecosystem.

424. Defendant additionally intercepted Plaintiffs' communications for the purpose of committing the independent tort of public disclosure of private facts, *as alleged in Count II and incorporated by reference herein*, which Defendant accomplished by disclosing the contents of the intercepted communications and associated identifiers into real-time-bidding auctions and to numerous separate recipients across the connected-television advertising and data-broker ecosystem.

425. That Defendant's interception was also motivated by commercial gain does not place its conduct outside 18 U.S.C. § 2511(2)(d). Defendant accomplishes its monetization of Plaintiffs' viewing activity through the very privacy invasions described above; the purpose of the interception, and its intended use, was to compile,

disclose, and exploit Plaintiffs' private viewing activity, and Defendant's resulting profit does not negate that tortious purpose.

426. Defendant's interception of Plaintiffs' communications was therefore carried out for a tortious purpose within the meaning of 18 U.S.C. § 2511(2)(d), and the party exception does not shield Defendant from liability.

427. Defendant also used and disclosed the contents of Plaintiffs' intercepted communications, together with associated identifiers, in real time and near-real time to multiple separate recipients—including Samba TV, Inc. and Google LLC, and downstream demand-side platforms, supply-side platforms, identity-resolution providers, data brokers, and measurement and attribution providers, and into real-time-bidding auctions—in violation of 18 U.S.C. § 2511(1)(c) and (d), knowing and having reason to know that those contents had been obtained through the interception described above. This widespread disclosure further confirms that Defendant's purpose in intercepting Plaintiffs' communications was to commit the privacy torts described above.

428. Accordingly, any purported consent—whether actual, implied, or constructive—does not shield Sony from liability under the Federal Wiretap Act.

429. Defendant's disclosures further obscured the nature of its surveillance through misleading terminology, including labeling its ACR features as "Performance and Analysis Data" or "Smart TV Experience" / "Use Info from TV Inputs."

430. Sony presented disclosures during a forced, multi-step setup process that conditioned use of the television on clicking through all terms, without affording consumers a meaningful opportunity to review, understand, or decline them, and failed to clearly inform users that Sony would intercept, record, analyze, and monetize the content of their communications.

431. Defendant's conduct therefore was not authorized by law and does not fall within any statutory exception.

432. As a direct and proximate result of Defendant's violations of the Federal Wiretap Act, Plaintiffs and members of the Nationwide Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

433. Pursuant to 18 U.S.C. § 2520, Plaintiffs and members of the Nationwide Class seek statutory damages, punitive damages, injunctive relief, and all other relief available under the law.

**COUNT IX**

**Violation of the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710**

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Classes)

434. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

435. Plaintiffs bring this claim under the VPPA, 18 U.S.C. § 2710.

436. The VPPA prohibits a "video tape service provider" from knowingly disclosing to any person personally identifiable information concerning a consumer's request for or obtaining of specific video materials or services, without the informed, written consent of the consumer.

437. Defendant was, and is, a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4), because it engaged in the business of delivering, providing, and facilitating access to audiovisual content and video programming through its Smart TVs and integrated software platforms.

438. More specifically, Sony is "engaged in the business of … rental, sale, or delivery of … similar audio visual materials" under 18 U.S.C. § 2710(a)(4) because, inter alia: (i) Sony markets, distributes, and operates streaming-video services that

are pre-installed and prominently featured on Sony Smart TVs, including curated catalogs of video content delivered to consumers directly by Sony; (ii) Defendant's Smart TV home screens and content-discovery rails curate and surface specific audiovisual content from Sony-controlled video sources to the consumer; and (iii) Sony makes available to consumers an integrated platform through which audiovisual content is delivered. Defendant's video-content-delivery business constitutes a substantial focus of Defendant's work.

439. Plaintiffs are "consumers" under 18 U.S.C. § 2710(a)(1) because each Plaintiff is, at minimum, a "subscriber" of Defendant's video goods or services. Each Plaintiff connected their Sony Smart TV with Sony on initial device setup; each Plaintiff provided personal information to Sony in connection with that connection; and each Plaintiff has accessed audiovisual content delivered through Defendant's integrated streaming services. These commitments and exchanges of value satisfy the "subscriber" definition.

440. The information Sony has knowingly disclosed constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) and the "ordinary person" test. Specifically, Sony has disclosed to Samba TV and Google, Samba TV, and other downstream recipients—in real time and near-real time, in transmissions transmitted from each Plaintiff's Sony Smart TV—the specific audiovisual content viewed by Plaintiffs (including specific program titles, episodes, advertisements, and external-input identifications) tied directly and inextricably to persistent identifiers (including IP address, MAC address, advertising identifier, household identifier, and Sony account identifier). The combination of specific viewing-content identification + persistent personal identifiers "readily permits an ordinary person to identify a particular individual as having watched certain videos"—indeed, that combination is precisely the basis on which Samba TV and Google construct identity-graph profiles,

target consumers across devices, and measure advertising attribution at the household and individual level.

441. Each Plaintiff was a "consumer" within the meaning of 18 U.S.C. § 2710(a)(1), as Plaintiffs used Defendant's Smart TV services to obtain video content.

442. Defendant knowingly disclosed to third parties personally identifiable information ("PII") concerning Plaintiffs' requests for and viewing of specific video materials and services.

443. Specifically, Sony collected and disclosed detailed information about the audiovisual content displayed on Plaintiffs' television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

444. This information included content viewed through streaming applications, broadcast signals, and external devices connected via HDMI.

445. Sony disclosed this viewing information to third parties, including advertisers, analytics providers, and other commercial entities.

446. Upon information and belief, Sony disclosed Plaintiffs' viewing data in conjunction with persistent identifiers and other information that allowed third parties to identify Plaintiffs and/or Plaintiffs' households.

447. These identifiers included, among other things, device identifiers, network identifiers, and other unique identifiers associated with Plaintiffs' Smart TV.

448. By linking viewing information with such identifiers, Sony disclosed information that identified Plaintiffs as having requested or obtained specific video materials or services.

449. The information disclosed by Sony therefore constituted "personally identifiable information" within the meaning of the VPPA.

450. Sony made these disclosures knowingly.

451. Plaintiffs did not provide informed, written consent to Defendant's disclosure of Plaintiffs' personally identifiable viewing information.

452. Plaintiffs and members of the Nationwide Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

453. Sony also failed to disclose the scope, nature, and purpose of such disclosures.

454. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

455. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

456. Defendant's conduct constituted a violation of 18 U.S.C. § 2710(b)(1).

457. As a direct and proximate result of Defendant's violations of the VPPA, Plaintiffs and members of the Nationwide Class have suffered harm, including invasion of privacy and loss of control over personal information.

458. Pursuant to 18 U.S.C. § 2710(c), Plaintiffs and members of the Nationwide Class seek statutory damages, punitive damages, attorneys' fees and costs, injunctive relief, and all other relief available under the law.

**COUNT X**

**Negligence**

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

459. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

460. Plaintiffs bring this claim under California common law and, if necessary, in the alternative to Plaintiffs' counts for intentional torts and statutory violations.

461. California law governs Plaintiffs' negligence claims because the conduct giving rise to those claims—Defendant's design, configuration, integration, operation, and ongoing support of the ACR functionality, and its decisions to collect, transmit, and disclose Plaintiffs' viewing data—emanated from and occurred at Defendant's principal place of business in San Diego, California, giving California the most significant relationship to these claims. In the alternative, to the extent the law of any Plaintiff's home state governs that Plaintiff's negligence claim—including Pennsylvania as to Plaintiff Rudnick, Washington as to Plaintiff Dionne, and Illinois as to Plaintiff Shine—the elements of negligence (duty, breach, causation, and damages) are materially the same under those States' laws, and Plaintiffs plead their negligence claims under the applicable law of each such State in the alternative.

462. At all relevant times, Defendant owed Plaintiffs and members of the Class a duty to exercise reasonable care in the design, development, manufacture, configuration, and operation of its Smart TVs and embedded software systems.

463. Defendant's duty of reasonable care extends to refraining from the unauthorized interception, use, and disclosure of Plaintiffs' and Class Members' viewing communications and identifiers, and to making accurate and adequate disclosures of its data-collection practices, given Defendant's exclusive knowledge of those practices and the foreseeable harm to consumers from their concealment.

464. Defendant's breaches of duty include the active design and operation of an architectural surveillance and disclosure pipeline that intentionally collects, transmits, and re-distributes Plaintiffs' sensitive viewing data and identifiers, in violation of Plaintiffs' reasonable expectations and applicable law. Negligent design and negligent configuration of consumer-electronic devices—as distinct from negligent failure to safeguard data already lawfully collected—are independently actionable.

465. Sony also owed a duty to refrain from collecting, accessing, using, and disclosing Plaintiffs' personal information without authorization or adequate disclosure.

466. Sony further owed a duty to implement reasonable practices to protect consumers' privacy and to avoid engaging in conduct that foreseeably invaded users' privacy interests.

467. Sony knew or should have known that its Smart TVs would be used within consumers' homes and would display sensitive audiovisual content reflecting users' personal interests, habits, and preferences.

468. Sony knew or should have known that the continuous monitoring and capture of such content through ACR technology would intrude upon users' privacy and expose personal Sensitive Information.

469. Sony breached its duties by, among other things:

- designing and deploying ACR technology that continuously monitored and captured audiovisual content displayed on users' televisions;
- collecting detailed information about Plaintiffs' viewing activity without adequate disclosure or authorization;
- accessing and extracting data from Plaintiffs' Smart TV for purposes unrelated to core device functionality;
- failing to implement reasonable and transparent consent mechanisms;
- obscuring its data collection practices through misleading terminology and design; and
- disclosing or making available Plaintiffs' viewing information to third parties for commercial purposes.

470. Defendant's conduct fell below the standard of care expected of a reasonable company operating connected consumer devices in the home.

471. Defendant's actions were negligent and created a foreseeable risk of harm to Plaintiffs and members of the Class.

472. Plaintiffs and members of the Class did not consent to Defendant's conduct.

473. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

474. Defendant's conduct was a substantial factor in causing harm to Plaintiffs and members of the Class.

475. As a direct and proximate result of Defendant's negligence, Plaintiffs and members of the Class have suffered damages, including invasion of privacy, loss of control over personal information, and the unauthorized use and exploitation of their data.

476. Plaintiffs and members of the Class are entitled to recover damages, injunctive relief, and all other relief available under California law.

**COUNT XI**

**Violation of California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq*.**

(Against Defendant Sony Electronics Inc. on Behalf of California Plaintiffs and the California Subclasses; and, as to the public injunction, on behalf of the California general public)

477. California Plaintiffs (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

478. Plaintiffs bring this claim under California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq*.

479. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice.

480. Defendant engaged in unlawful, unfair, and fraudulent business acts and practices in connection with its Smart TVs and embedded ACR technology.

**Unlawful Prong**

481. Defendant's conduct violated multiple laws, including but not limited to:

- the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, 638.50–638.51);
- the Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502); and
- the Federal Wiretap Act (18 U.S.C. § 2510 *et seq*.).

482. These violations constitute "unlawful" business acts and practices under the UCL.

**Unfair Prong**

483. Defendant's conduct was unfair because it offended established public policy and was immoral, unethical, oppressive, and substantially injurious to consumers.

484. Defendant's conduct caused substantial injury to Plaintiffs and members of the Class by invading their privacy and misappropriating their personal information.

485. The harm to Plaintiffs and members of the Class outweighed any purported benefits associated with Defendant's conduct.

486. Plaintiffs and members of the Class could not reasonably have avoided the injury.

487. Defendant's surveillance practices were not necessary to provide the core functionality of its Smart TVs and instead served Defendant's commercial interests in data collection and advertising.

488. Sony continuously monitored the content displayed on consumers' televisions, including content from streaming applications, broadcast signals, and HDMI-connected devices.

489. Sony collected, analyzed, and monetized detailed information about Plaintiffs' viewing activity.

490. Sony also shared or made this information available to third parties, including advertisers and analytics providers.

491. Defendant's conduct therefore constituted an unfair business practice.

**Fraudulent Prong**

492. Defendant's conduct was fraudulent because it was likely to deceive reasonable consumers.

493. Sony misrepresented and omitted material facts regarding its data collection and surveillance practices.

494. Sony used misleading terminology, including labeling its ACR features as "Performance and Analysis Data" or "Smart TV Experience" / "Use Info from TV Inputs," which did not disclose that the feature enabled continuous monitoring of on-screen content.

495. Sony failed to clearly disclose that it would capture, analyze, and monetize the audiovisual content displayed on consumers' televisions.

496. Sony also failed to disclose that such information would be shared with or made available to third parties.

497. Sony presented disclosures during a forced, multi-step setup process that conditioned use of the television on clicking through all terms, without affording consumers (or third parties who set up the TV) a meaningful opportunity to review, understand, or decline them.

498. Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

499. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

500. These misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase or use a Sony Smart TV.

501. Plaintiffs and members of the Class were likely to be deceived by Defendant's conduct.

502. As a result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiffs and members of the Class suffered injury in fact and lost money or property.

503. Plaintiffs and members of the Class lost the value of their personal information and the benefit of their bargain.

504. Plaintiffs and members of the Class would not have purchased, or would have paid less for, Sony Smart TVs had they known of Defendant's conduct.

505. Plaintiffs and members of the Class have suffered injury in fact and lost money or property as a direct result of Defendant's unfair, unlawful, and fraudulent business practices. Plaintiffs paid for their Sony Smart TVs (with the consumer purchase price flowing in substantial part to Defendant as wholesale revenue, even where the immediate point-of-sale transaction was through a retailer such as Best Buy, Costco, Target, or Walmart). Plaintiffs would not have purchased their Sony Smart TVs at the prices paid—and, on information and belief, would have purchased a competing television, paid less, or not purchased a Smart TV at all—had Defendant disclosed (i) Defendant's continuous, frame-by-frame ACR surveillance and (ii) Defendant's real-time and near-real-time disclosure of consumers' viewing communications and identifiers to multiple separate third parties, including Samba TV and Google.

506. Defendant's misrepresentations and material omissions are precisely the kind that satisfy the UCL "fraudulent" prong: Defendant's marketing materials,

packaging, and on-device disclosures portray the Sony Smart TV as a premium personal entertainment device that delivers personalized content recommendations and a tailored viewing experience, while affirmatively concealing (a) the existence and operation of continuous frame-by-frame ACR surveillance behind the misleading "Performance and Analysis Data" or "Smart TV Experience" / "Use Info from TV Inputs" labels, (b) the real-time disclosure of viewing data to Samba TV and Google, and (c) the transfer of, and facilitation of access to, bulk consumer data by Defendant's affiliates. These misrepresentations and omissions were material to Plaintiffs' purchasing decisions, and Plaintiffs reasonably relied on Defendant's representations and the absence of disclosure of these practices.

507. Plaintiffs' personal information and ACR-derived viewing data also have independent economic value in identifiable markets. Industry data confirms that consumer behavioral and viewing data has substantial and increasing per-user value—reflected in the existence of an established market in which companies (including Nielsen, UpVoice, HoneyGain, SavvyConnect, Google, and others) compensate consumers in exchange for license to track and use specified categories of behavioral data. Plaintiffs have been deprived of the ability to license, monetize, or otherwise control their viewing data through that market because Defendant's interception of Plaintiffs' viewing data and the re-distribution of that data through the broader CTV advertising ecosystem have already extracted, segmented, and monetized that data without Plaintiffs' consent. *See Brown v. Google LLC*, 2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021).

508. Plaintiffs lack an adequate remedy at law for the equitable relief they seek under the UCL. The injunctive and restitutionary relief Plaintiffs seek—including orders compelling Defendant to cease ongoing ACR collection, to delete or de-identify previously collected data, and to implement clear and conspicuous disclosures and meaningful opt-out controls—addresses future harm that is not

available through any of Plaintiffs' legal claims, which are limited to backward-looking compensatory and statutory damages. Plaintiffs therefore satisfy *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

509. Even if any of the foregoing economic-injury allegations were deemed insufficient, Plaintiffs alternatively seek disgorgement of Defendant's ill-gotten gains under the UCL on the basis that Defendant is not entitled to retain profits that they realized from the misappropriation of Plaintiffs' personal information and audiovisual communications, irrespective of any corresponding economic loss to Plaintiffs.

510. Plaintiffs seek restitution, injunctive relief, and all other relief available under Cal. Bus. & Prof. Code § 17203.

511. Plaintiffs, on behalf of the general public, seek public injunctive relief under the UCL, Cal. Bus. & Prof. Code § 17203, enjoining Sony from deploying, operating, or enabling Automatic Content Recognition technology that intercepts, records, or discloses the viewing activity or other personal information of California consumers without first obtaining clear, conspicuous, and separately disclosed consent. The primary purpose and effect of this relief is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Sony Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. Because Sony continues to manufacture, sell, and operate Smart TVs that perform this surveillance, its unlawful conduct is ongoing and, absent an injunction, will continue to harm the public at large. This relief is prospective, runs to the general public, and does not require the Court to consider the individual claims of any non-party. Plaintiffs and the general public have no adequate remedy at law to secure Defendant's future compliance with California law.

## COUNT XII

## Violation of the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750–1784 — Injunctive and Declaratory Relief Only

(Against Defendant Sony Electronics, Inc. on Behalf of California Plaintiffs and the California Subclasses; and, as to the public injunction, on behalf of the California general public)

512. California Plaintiffs (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

513. This Count seeks injunctive and declaratory relief only. Plaintiffs do not seek damages under the CLRA in this Count. Accordingly, the pre-suit notice and demand requirements of Cal. Civ. Code § 1782(a)–(b) do not apply, because those requirements govern only actions for damages. Cal. Civ. Code § 1782(d); *Gonzales v. CarMax Auto Superstores, LLC*, 845 F.3d 916 (9th Cir. 2017). Plaintiffs reserve the right to amend to add a claim for CLRA damages after serving the notice required by § 1782(a).

514. Plaintiffs and the members of the California Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d). The Sony Smart TVs are "goods" within the meaning of § 1761(a). Plaintiffs' purchases of Sony Smart TVs are "transactions" within the meaning of § 1761(e). The CLRA applies to Defendant's representations and omissions made to consumers through its packaging, marketing, and on-device user interface, even where the point-of-sale transaction occurred through an authorized retailer; privity is not required. *See Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310 (2011); Cal. Civ. Code § 1770(a).

515. Sony engaged in unfair and deceptive acts and practices declared unlawful by Cal. Civ. Code § 1770(a), including subdivisions (5), (7), (9), (14), and (16), by representing that the Sony Smart TVs have characteristics, uses, benefits, standards, qualities, or grades they do not have, advertising the goods with intent not

to sell them as advertised, and representing that the transaction confers or involves rights, remedies, or obligations it does not.

516. Sony represented, through its marketing, packaging, and on-device interface, that the Sony Smart TVs are premium personal-entertainment devices delivering personalized content and a tailored viewing experience, while concealing that the devices conduct continuous, frame-by-frame ACR surveillance of everything displayed on screen, transmit that data in real time to multiple separate third parties (including Samba TV and Google), and facilitate the transfer of bulk consumer data to Defendant's affiliates.

517. Sony had a duty to disclose the foregoing facts because (a) Sony had exclusive knowledge of the ACR architecture, data pipelines, and downstream recipients, which were not reasonably accessible to consumers; (b) Sony actively concealed these practices through benign-sounding labels—"Smart TV Experience" and "Use Info from TV Inputs" on Samba TV-based Sony Smart TVs, and "Performance and Analysis Data" on Google TV-based Sony Smart TVs, none of which identifies ACR functionality, any third-party recipient, or continuous surveillance—through bundled multi-step setup flows, and through opt-out controls dispersed across four or more menus requiring more than 200 clicks; and (c) Sony made partial representations about the devices' characteristics that were misleading absent disclosure of the surveillance.

518. The concealed and omitted facts were material: a reasonable consumer would consider them important in deciding whether to purchase or use a Sony Smart TV. Had Sony disclosed these facts at the point of sale or on its packaging or device interface, Plaintiffs and California Subclass members would have been aware of them and would not have purchased their Sony Smart TVs, or would have paid materially less. Because the omissions were material, reliance is presumed and inferred.

519. Plaintiffs have suffered "any damage" within the meaning of Cal. Civ. Code § 1780(a). Plaintiffs paid for, and overpaid for, their Sony Smart TVs as a result of Defendant's deceptive practices, and were deprived of the benefit of their bargain and of the value of their personal information, as alleged above.

520. Defendant's unlawful practices are ongoing. Each named Plaintiff continues to own and use his or her Sony Smart TV, which remains operational and connected, and Defendant's ACR system continues to intercept, collect, transmit, and disclose Plaintiffs' viewing activity and associated identifiers in real time and near-real time to the present day. Plaintiffs therefore face a real and immediate threat of continuing and future injury. An injunction would redress that injury by halting Defendant's ongoing and future collection and disclosure; monetary damages, which redress only past collection, cannot.

521. Plaintiffs lack an adequate remedy at law for the prospective relief sought in this Count. Monetary damages are retrospective and compensate only for past harm; the injunction sought here is prospective and is the only remedy that can prevent Defendant's continued and future interception and disclosure of Plaintiffs' and the public's viewing data.

522. Pursuant to Cal. Civ. Code § 1780(a)(2), Plaintiffs, individually and on behalf of the California Subclass, seek an order enjoining Defendant's unlawful methods, acts, and practices, and a declaration that those practices violate the CLRA.

523. Plaintiff Powell and Plaintiff Carpe are a "senior citizens" within the meaning of California Civil Code § 1761(f), and a substantial number of the members of the California Subclasses are likewise senior citizens. Senior citizens are substantially more vulnerable to Defendant's deceptive and opaque consent design—including its reliance on buried, multi-layer opt-out settings—are less likely to discover or disable Defendant's ACR surveillance, and suffered harm as a result. To the extent monetary relief is awarded in this action under California Civil Code §

1780, Plaintiffs Powell and Carpe and all senior citizens in the California Subclasses are entitled to the additional relief available to senior citizens under California Civil Code § 1780(b) and § 3345.

524. In addition, on behalf of the general public, Plaintiffs seek a public injunction under the CLRA whose primary purpose and effect is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Sony Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. This relief is prospective, runs to the general public as a whole rather than a discrete subset of similarly situated persons, and does not require the Court to consider the individual claims of any non-party.

525. Plaintiffs accordingly seek injunctive and declaratory relief requiring Sony to: (a) cease intercepting, recording, collecting, using, and disclosing consumers' viewing data through ACR technology without first obtaining valid, informed, affirmative, and standalone consent; (b) obtain affirmative, informed, and standalone consent before enabling or engaging in any ACR-based data collection on its Smart TVs; (c) refrain from using deceptive terminology, pre-checked defaults, or dark patterns to obtain or imply consent; (d) implement clear, conspicuous, and truthful disclosures regarding its data collection and sharing practices; and (e) provide current and future users a simple, effective, and easily accessible means to disable ACR functionality.

526. Concurrently with this Complaint, Plaintiffs file the affidavit required by Cal. Civ. Code § 1780(d) showing that this action is commenced in a proper forum.

/

/

/

/

## COUNT XIII

## Unjust Enrichment

(Against Defendant Sony Electronics Inc. on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

527. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

528. Plaintiffs bring this claim for unjust enrichment under California law.

529. Defendant received and retained benefits at the expense of Plaintiffs and members of the Class.

530. Specifically, Sony received two distinct categories of benefit at Plaintiffs' expense. First, Sony received the consumer purchase price for the Sony Smart TVs Plaintiffs purchased—even where the immediate point-of-sale transaction was through a retailer such as Amazon, Best Buy, Costco, Sam's Club, Target, or Walmart, the substantial economic value of the consumer purchase price flowed back to Sony as wholesale revenue, and Sony would not have realized that wholesale revenue but for Plaintiffs' consumer-side purchases. Second, Sony received—directly and through its commercial relationships with Samba TV and Google—the substantial commercial benefit of the bulk ACR-derived data captured from Plaintiffs' in-home use of the Sony Smart TV, which Defendant and its downstream partners monetized through targeted advertising, audience segmentation, identity-graph construction, and measurement and attribution products. By 2021, the smart-TV manufacturer Vizio publicly reported that its profits from monetization of ACR-derived consumer data exceeded its profits from the sale of the televisions themselves.

531. Defendant's retention of these benefits is unjust because Defendant secured them through misrepresentation, omission, and dark-pattern consent architecture: Defendant's marketing, packaging, and on-device disclosures concealed

the true nature, scope, and downstream uses of Defendant's ACR-data collection, and Defendant's consent architecture was designed to create a false appearance of consumer agreement—through bundled multi-step setup flows, buried opt-out controls, and other manipulative interface design—without obtaining Plaintiffs' informed agreement to Defendant's ACR data collection.

532. In the alternative, Plaintiffs seek disgorgement of Defendant's ill-gotten gains as an independent remedy. Even if any individual Plaintiffs are unable to establish a corresponding economic loss, Defendant is not entitled to retain profits realized from the misappropriation of Plaintiffs' personal information and audiovisual viewing communications.

533. Plaintiffs conferred benefits on Sony, including payment for the Smart TV and valuable data generated through Plaintiffs' use of the device.

534. Plaintiffs' viewing activity and associated data constituted valuable information that Sony collected, analyzed, and monetized.

535. Sony knowingly accepted and retained these benefits.

536. Sony appreciated and understood that it was receiving valuable benefits from Plaintiffs, including access to and use of Plaintiffs' personal information.

537. Sony obtained these benefits through its collection, use, and disclosure of Plaintiffs' viewing data via its Smart TVs and embedded ACR technology.

538. Sony used Plaintiffs' data for commercial purposes, including advertising, analytics, profiling, and data monetization.

539. Sony also shared or made this data available to third parties, thereby further profiting from Plaintiffs' information.

540. Defendant's retention of these benefits was unjust because it was obtained through deceptive, unlawful, and unfair conduct.

541. Sony collected and used Plaintiffs' data without valid consent.

542. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Sony for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XIV, *supra*.

543. It would be inequitable and unjust for Sony to retain the benefits it obtained from Plaintiffs and members of the Class.

544. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm.

545. Plaintiffs seek restitution, disgorgement of all ill-gotten gains, and all other relief available under California law.

**COUNT XIV**

**Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86 et seq.**

(On Behalf of Plaintiff Dionne and the Washington Subclasses)

546. Plaintiff Dionne realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

547. The circumstances of Defendant's misrepresentations and omissions—the who, what, when, where, and how—are pleaded with particularity in the section titled § XIII, *supra*, and are incorporated here to satisfy Federal Rule of Civil Procedure 9(b) to the extent it applies to this Count.

548. The Washington Consumer Protection Act prohibits unfair or deceptive acts or practices in the conduct of trade or commerce that affect the public interest. Defendant's surreptitious ACR data collection, its misleading terminology and dark-pattern consent architecture, and its concealment of the interception and disclosure of consumers' viewing activity are unfair and deceptive acts and practices in trade or commerce that affect the public interest.

549. Defendant's conduct caused injury to Plaintiff Dionne and the Washington Subclasses in their business or property, including the economic injuries alleged herein. As a result, Plaintiff Dionne and the Washington Subclasses are entitled to damages, treble damages, injunctive relief, and attorneys' fees and costs under Wash. Rev. Code § 19.86.090.

**COUNT XV**

**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1 et seq.**

(On Behalf of Plaintiff Rudnick and the Pennsylvania Subclasses)

550. Plaintiff Rudnick realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

551. The circumstances of Defendant's misrepresentations and omissions—the who, what, when, where, and how—are pleaded with particularity in the section titled § XIII, *supra*, and are incorporated here to satisfy Federal Rule of Civil Procedure 9(b) to the extent it applies to this Count.

552. The Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits unfair or deceptive acts or practices in the conduct of trade or commerce. Defendant's surreptitious ACR data collection, misleading terminology, dark-pattern consent architecture, and concealment of its interception and disclosure of viewing activity constitute such unfair and deceptive acts and practices.

553. Plaintiff Rudnick purchased a Sony Smart TV primarily for personal, family, or household purposes and justifiably relied on Defendant's representations and material omissions. As a result of Defendant's conduct, Plaintiff Rudnick and the Pennsylvania Subclasses suffered ascertainable loss of money or property and is entitled to actual damages, treble damages, injunctive relief, and attorneys' fees and costs under 73 Pa. Stat. § 201-9.2.

**COUNT XVI**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**

(On Behalf of Plaintiff Shine and the Illinois Subclasses)

554. Plaintiff Shine realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

555. The circumstances of Defendant's misrepresentations and omissions—the who, what, when, where, and how—are pleaded with particularity in the section titled § XIII, *supra*, and are incorporated here to satisfy Federal Rule of Civil Procedure 9(b) to the extent it applies to this Count.

556. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits unfair or deceptive acts or practices, including the concealment, suppression, or omission of material facts, in the conduct of trade or commerce. Defendant's surreptitious ACR data collection, misleading terminology, dark-pattern consent architecture, and concealment of its interception and disclosure of viewing activity constitute such unfair and deceptive acts and practices, which Defendant intended consumers to rely upon.

557. As a result of Defendant's conduct, Plaintiff Shine and the Illinois Subclasses suffered actual damage and is entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs under 815 ILCS 505/10a.

**COUNT XVII**

**Public Injunctive Relief on Behalf of the General Public**

(Against Defendant Sony Electronics, Inc.; and, in the alternative, Classwide Injunctive Relief on Behalf of the Nationwide Classes or the California Subclasses)

558. California Plaintiffs (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein,

including the public-injunction allegations set forth in their UCL, CLRA, and California constitutional privacy counts.

559. Plaintiffs bring this claim for public injunctive and declaratory relief as a remedy independently authorized by, and integral to, the substantive claims pleaded herein. Plaintiffs seek public injunctive relief under three independent and mutually reinforcing bases: (i) the Unfair Competition Law, Cal. Bus. & Prof. Code § 17203; (ii) the Consumers Legal Remedies Act, Cal. Civ. Code § 1780(a)(2)—which, as sought here, seeks injunctive and declaratory relief only, with no damages, such that the pre-suit notice requirement of § 1782(a) does not apply (*id*. § 1782(d)); and (iii) the self-executing California constitutional right to privacy, Cal. Const. art. I, § 1, for which injunctive relief is the recognized and primary remedy. To the extent the Court determines that injunctive relief is not properly pleaded as a stand-alone count, Plaintiffs incorporate the allegations of this Count into each of the foregoing substantive counts (including the UCL and CLRA counts) as a remedial component.

560. The UCL and the CLRA are statutes "established for a public reason" within the meaning of Cal. Civ. Code § 3513, and binding case law holds that the statutory right to seek public injunctive relief under those consumer-protection statutes cannot be waived by private agreement and is unenforceable insofar as a predispute agreement purports to waive it in any forum.

561. The California constitutional right to privacy is self-executing and "creates a legal and enforceable right of privacy for every Californian." *White v. Davis*, 13 Cal. 3d 757 (1975). It protects natural persons against intrusions by private entities. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1 (1994). Because that right was established for a public reason, the right to seek prospective injunctive relief restraining its ongoing violation is likewise a right that "cannot be contravened by a private agreement." Cal. Civ. Code § 3513.

562. Plaintiffs, on behalf of the general public, seek a public injunction under the UCL, the CLRA, and the California Constitution whose primary purpose and effect is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Sony Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. This relief is prospective, runs to the general public as a whole rather than a discrete subset of similarly situated persons, and does not require the Court to consider the individual claims of any non-party.

563. Sony continues to manufacture, sell, and operate Smart TVs that perform ACR surveillance, such that members of the public who have not yet acquired a Sony Smart TV will be subjected to the same unlawful practices upon doing so. Absent a public injunction, Sony will continue these practices against the consuming public indefinitely.

564. Plaintiffs are aggrieved Californians whose constitutional and statutory privacy rights Sony has violated, and they face a real and immediate threat of continued and future injury because they continue to own and use Sony Smart TVs on which ACR functionality remains enabled or available. As aggrieved individuals with standing, Plaintiffs may seek public injunctive relief that primarily benefits the general public without acting as private attorneys general or prosecuting the action on behalf of others.

565. Plaintiffs and the general public lack an adequate remedy at law; the CLRA (§ 1780(a)(2)) authorizes injunctive relief, and under the California constitutional right to privacy, injunctive relief—not damages—is the recognized remedy.

566. Plaintiffs accordingly seek a public injunction requiring Sony to:

- cease intercepting, recording, collecting, using, and disclosing consumers' viewing data through ACR technology without first obtaining valid, informed, affirmative, and standalone consent;
- obtain affirmative, informed, and standalone consent before enabling or engaging in any ACR-based data collection on its Smart TVs;
- refrain from using deceptive terminology, pre-checked defaults, or dark patterns to obtain or imply consent to ACR-based data practices;
- implement clear, conspicuous, and truthful disclosures regarding its data collection and sharing practices; and
- provide current and future users with a simple, effective, and easily accessible means to disable ACR functionality.

567. The balance of equities and the public interest favor a public injunction enjoining Defendant's ongoing unlawful, unfair, and deceptive conduct directed at California consumers at large.

568. In the alternative, and only to the extent the Court declines to grant public injunctive relief, Plaintiffs seek classwide injunctive relief on the substantive counts on behalf of the Nationwide Classes or, in the alternative, the California Subclasses, pleaded separately so as not to limit or privatize the public injunctive relief sought above.

569. Plaintiffs and the general public are therefore entitled to injunctive and declaratory relief as requested herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and against Sony as follows:

a. An order certifying this action as a class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel under Federal Rule of Civil Procedure 23;

b. A public injunction, on behalf of the general public, pursuant to Cal. Bus. & Prof. Code § 17203, Article I, § 1 of the California Constitution, and Cal. Civ. Code § 1780(a)(2), enjoining Sony from deploying, operating, or enabling ACR technology that intercepts, records, or discloses the viewing activity or other personal information of California consumers without first obtaining clear, conspicuous, affirmative, and separately disclosed consent—the primary purpose and effect of which is to prohibit unlawful acts that threaten future injury to the general public, and which does not require adjudication of any non-party's individual claim;

c. On the CLRA Count, injunctive relief pursuant to Cal. Civ. Code § 1780(a)(2) and a declaration that Defendant's practices violate the CLRA;

d. In the alternative to the public injunction, classwide injunctive and declaratory relief on behalf of the Class;

e. Restitution and disgorgement under Cal. Bus. & Prof. Code § 17203 and Plaintiffs' unjust-enrichment claim;

f. On all Counts other than the CLRA Count, an award of damages—actual, statutory, compensatory, general, special, incidental, consequential, nominal, and punitive—in amounts to be determined at trial;

g. A declaratory judgment that Defendant's practices violate the laws alleged herein;

h. Pre- and post-judgment interest to the extent provided by law;

i. An award of attorneys' fees and costs to the extent provided by law; and

j. Such other relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated: July 8, 2026

Respectfully submitted,

By: */s/ Andrew R. Tate*

**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**

Andrew R. Tate*
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Tel: (314) 669-3600
atate@peifferwolf.com

Melisa A. Rosadini-Knott
(California Bar No. 316369)
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
Tel: (323) 982-4109
mrosadini@peifferwolf.com

Brandon M. Wise*
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825
bwise@peifferwolf.com

Wail Jihadi*
1701 Pennsylvania Ave. N.W., Suite 200,
Washington, DC 20006
Tel: (202) 216-1541
wjihadi@peifferwolf.com

/

/

**SIRI & GLIMSTAD LLP**

Sonjay C. Singh*
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Catherine E. Ybarra (SBN # 283360)
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Tel: (213) 297-3807
E: cybarra@sirillp.com

*Counsel for Plaintiffs and Interim Lead Class Counsel for the Proposed Class*

**Admitted pro hac vice*